In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1001

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

NOE MANCILLAS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 97 CR 64--Sarah Evans Barker, Chief Judge.

ARGUED October 1, 1998--DECIDED JULY 7, 1999

Before COFFEY, KANNE and DIANE P. WOOD, Circuit
Judges.

COFFEY, Circuit Judge.  Noe Mancillas was
convicted before a jury of being a felon in
possession of a firearm, one count of possession
of marijuana with intent to distribute, and one
count of knowingly carrying a firearm during, and
in relation to, a drug trafficking offense. On
appeal, Mancillas challenges the district court's
denials of written and oral motions to suppress,
the admission of expert testimony by a law
enforcement officer, the court's jury
instructions, as well as the sentencing judge's
refusal to grant a reduction for acceptance of
responsibility under USSG sec. 3E1.1 and the
court's enhancement for obstruction of justice
pursuant to USSG sec. 3C1.1. We AFFIRM.

BACKGROUND

A. The December 17, 1996, Stop and Arrest of
Defendant-Appellant Noe Mancillas.

   On December 17, 1996, at about 1:35 a.m.,
Indianapolis Police Department ("IPD") Officer
Douglas Cook was patrolling the south side of
Indianapolis in his marked police cruiser when he
received a radio dispatch reporting that the IPD
had just received an anonymous telephone tip from
an unidentified citizen who observed a Hispanic
male with a gun in his hand seated in a blue

Mercedes-Benz parked in the Hot's Show Club ("the Club"), located at 255 West Morris Street, Indianapolis, Indiana. Officer Cook was within one mile of the Club when he initially heard the radio dispatch and immediately responded to the call despite the fact that it was snowing heavily at that time.

The Club's parking lot was illuminated with two large security lights, and upon entering the lot, Cook immediately spotted the blue Mercedes. Cook pulled his cruiser to within approximately fifteen to twenty feet of the car, with his vehicle facing the front of the Mercedes at an angle. At this time, Cook activated the high-intensity spotlight on his squad car. After the officer illuminated the Defendant's vehicle, a Hispanic male (who later proved to be Appellant Noe Mancillas) exited the front driver's side door, and two white males (Chuckie Will Hardman and James Marshall) also exited the car. Patrolman Cook testified that after the individuals left the vehicle, each of them began to walk in a different direction, and only Hardman walked toward the entrance of the Club even though it was the only business enterprise open after 1:30 a.m.

Officer Cook exited his squad car, drew his revolver, and directed the suspects to stop and return to their car. The suspects complied, and Cook, who stood near his driver's door about ten or twelve feet from the Mercedes, instructed the three men to bend from the waist and individually place their hands on the car's hood. Cook testified that at that time, "for officer safety, being by myself [with] three gentlemen in front of me with [a] suspected handgun involved, I was going to wait for my backup." After each of the suspects placed their hands on the car's hood, Cook walked toward them and observed what he believed to be a "chrome handgun lying on top of the dash[board] directly over the steering wheel of the [Mercedes] vehicle." Cook stated that despite the snowy and wintery conditions, he was able to see the gun on the dashboard because an area at the base of the windshield was clear, possibly because the engine had been running and the defroster had been operating.

Approximately one minute after Cook directed the suspects to return to their car, backup IPD Officer James Lopossa arrived, parked, and assisted Cook in conducting a "patdown" of the suspects to ensure that they were unarmed. He did not find any weapons on the suspects. During this period of time, Patrolman Cook remained near his vehicle but continued to have his gun drawn in order that he might "cover" his partner Lopossa during the patdown safety search. At

trial, in response to questioning by Mancillas' attorney, Cook testified that the suspects were no longer free to leave at the time of the patdown search and stated that the individuals were "detained" but were not "in custody."

After Lopossa finished with the patdown weapon search of the suspects, Cook re-holstered his revolver and walked toward the Mercedes and the suspects, and as he neared the vehicle he again observed the gun in plain view on the dashboard. Officer Cook asked the three subjects, "who's got the gun in the car?" The only response came from Appellant Mancillas, who stated simply, "no." Cook then asked, "is there a gun in the car?" Mancillas again responded "no," while the others remained silent. Cook asked the subjects another time if there was a gun in the car, and again, Mancillas replied "no." Finally, Cook informed the men that he had received a radio report that someone seated in a blue Mercedes parked at the Club was holding a gun, and Cook faced Mancillas directly and asked him, "[i]s there a gun in the car?", at which time Mancillas, who had been seated in the driver's seat prior to exiting his vehicle, admitted that there was a gun inside the vehicle but when asked, failed to state who owned the gun.

Cook attempted to open the driver's door, found it locked and asked Mancillas whether he had the keys and Mancillas gave them to him. Cook unlocked and opened the driver's door, pointed out that there was a gun on the dashboard above the steering wheel, and asked Mancillas "what [is] this?" According to Cook, Mancillas responded, "[t]hat's my gun." An inspection revealed that the handgun was a loaded Taurus .40 caliber weapon containing eleven rounds of ammunition in the magazine and one live round in the chamber.

Officer Lopossa next opened the passenger's front door and discovered a second gun lying on the console between the bucket seats. The second gun was a loaded Raven Arms .25 caliber semi-automatic weapon with four rounds in the magazine and one live round in the chamber. Lopossa unloaded the second handgun. Cook also had an opportunity to observe drug paraphernalia lying on the console in plain view consisting of several glass crack pipes, a mini butane torch, a set of portable digital scales, a pager, and a white rock that Cook recognized (due to his training) as crack cocaine wrapped inside a clear baggie. Cook testified that based upon his training and experience, he was aware that butane torches were often used to light crack pipes, and that scales were used to measure the weight of controlled substances. Cook further testified

that at this juncture, "everyone [was] effectively under arrest" for possession of controlled substances and drug paraphernalia.

Patrolman Cook walked to the front of the car and asked each of the men whether any of them had permits to possess the guns found in the Mercedes and each of them replied "no." Cook then asked if any of them were the owner of the Raven Arms handgun that Lopossa had discovered, and each suspect denied ownership. (Hardman later admitted that the weapon was his.)

Prior to impounding the vehicle, Officer Cook conducted an inventory search of the Mercedes and explicitly listed in detail the drugs and drug paraphernalia described previously as well as BIC lighters and several small screens commonly used to smoke cocaine. In performing the search, Cook also opened the trunk of the Mercedes and discovered a large, clear plastic sealable bag containing what he believed to be "one-half brick" of marijuana. Inside the bag, facing out, was a piece of paper bearing the notation "420 G"; Cook later became aware that this notation referred to the quantity of the marijuana contained in the bag: 420 grams.

Shortly thereafter, a police conveyance vehicle arrived and transported the suspects to police headquarters. The officers conducted a more thorough search of the arrestees before placing them in the police vehicle. Mancillas was found to be carrying two pagers, a cellular phone, and $2440 in cash. The search of Marshall resulted in the discovery of a disposable syringe and three rocks of crack cocaine. As a result of these events, on May 28, 1997, a grand jury sitting in the Southern District of Indiana returned a five-count Indictment against Defendant Mancillas. The Indictment charged as follows:

Count One:  felon in possession of a firearm (the Taurus .40 caliber pistol) (18 U.S.C. sec. 922(g)(1));

Count Two:  possession of cocaine with intent to distribute (21 U.S.C. sec. 841(a)(1));

Count Three:  possession of marijuana with intent to distribute (21 U.S.C. sec. 841(a)(1));

Count Four:  knowingly carrying a firearm during and in relation to a drug trafficking offense (cocaine) (18 U.S.C. sec. 924(c)(1)); and

Count Five:  knowingly carrying a firearm during and in relation to a drug trafficking offense (marijuana) (18 U.S.C. sec. 924(c)(1)).

On June 4, 1997, Mancillas made his initial appearance, entered a plea of not guilty to each of the five charges alleged in the Indictment, and requested a jury trial.

B. Mancillas' Written Motion to Suppress Physical Evidence Obtained from the Interior and the Trunk of the Mercedes.

On June 20, 1997, Mancillas filed a written motion to suppress the physical evidence seized at the time of his arrest (12/17/96) arguing that the searches of the interior and the trunk of his Mercedes violated his Fourth Amendment rights. On September 12, 1997, the trial court conducted a hearing on Mancillas' motion to suppress and Officer Cook testified (as described before) to the events on the date of Mancillas' arrest. After the hearing, the district judge entered a written order denying Mancillas' motion to suppress the physical evidence.

Initially, the judge ruled that Patrolman Cook had reasonable suspicion to investigate Mancillas and the other suspects. She noted that the radio dispatch

stated that a Hispanic man in a blue (or dark) Mercedes had a gun in the Hot[']s Show Club parking lot. This report was confirmed . . . when the officer, arriving at the club, saw the Defendant, a Hispanic man, and his passenger inside a blue Mercedes parked in the parking lot. The three men exited the car in a suspicious manner immediately after the officer flashed his spotlight on the front of the vehicle, walking off in different directions. None of them spoke to the officer. As he approached, the officer called to them, directing them to return to their car. As the officer approached Defendant and his passengers, he spotted a handgun on the dashboard, which confirmed the remainder of details from the radio dispatch. When he asked the three men about the gun, all denied possession and ownership. The officer detained Defendant and his passengers for further questioning and continued to inquire about ownership of the gun and whether anyone had a permit for it. After four separate inquiries to this effect, Defendant finally admitted generally that there were firearms in the car, but still no one claimed ownership at the time. To this point, no specific violation of law had occurred, although the officer had reasonable suspicion to continue his questioning.

Based on the totality of the facts and circumstances presented, the trial judge found that Officer Cook had a reasonable suspicion to believe that criminal activity may have been

occurring, or about to occur, and ruled that the officer's actions in stopping and detaining the suspects were legal. See United States v. Sokolow, 490 U.S. 1, 7-8 (1989); Terry v. Ohio, 392 U.S. 1, 29-30 (1968).

In addition, the district judge found that the search and seizure of physical evidence fell within the parameters of the Fourth Amendment for two stated reasons. Initially, the trial judge found that Patrolman Cook observed the gun in plain view on the dashboard and drug paraphernalia in the front seat area, and thus he had probable cause to search the interior of the automobile and other areas of the vehicle for other contraband or evidence of a crime. See California v. Acevedo, 500 U.S. 565, 569 (1991); United States v. Patterson, 65 F.3d 68, 70 (7th Cir. 1995). The trial court also determined that Mancillas gave his car keys to Officer Cook upon request and thus consented to the search of his vehicle.

At trial, in the absence of the jury, Mancillas' counsel again raised the Fourth Amendment issues originally debated in his motion to suppress the physical evidence seized from his vehicle, claiming that Mancillas' original stop and detention, as well as the search of his vehicle, were unconstitutional. The district judge at this time elaborated on her written decision denying the motion, stating that Officer Cook had reasonable suspicion to stop the suspects because the details contained in the radio dispatch were confirmed when he reached the parking lot, and the suspects exited the car and walked away in a suspicious fashion. These factors, combined with the report of a gun and the officer's observation of the gun on the dashboard, "planted in Cook a reasonable suspicion that there was more to investigate here." The judge continued, finding that:

Officer Cook's [decision to] pull his firearm in order to secure the compliance of the three suspects . . . did not amount to a custodial stop. It was a brief restriction of their liberty. It was for a valid investigative purpose. The officer had reasonable suspicion to investigate, and he has testified that he did not place any of the Defendants under arrest until after he had established that there was no firearm permit. . . . The conduct of Officer Cook was neither coercive nor intimidating under those circumstances. And, . . . the scope of the detention did not exceed Terry standards so as to become a custodial interrogation. And the restriction of the [Defendant's] liberty, was brief both in terms of the time it required and the extent of the intrusion.

C. Mancillas' Oral Motion to Suppress Statements he Made at the Time of his Detention and Arrest.

Also on September 12, 1997, during the hearing on Mancillas' motion to suppress, Mancillas made an oral motion to suppress the statements he had made at the time of his arrest, including his admissions as to the ownership of the Taurus handgun on the dashboard and that he lacked a permit for the same. Mancillas alleged that the statements were inadmissible on the ground that the officers on the scene failed to advise him either before or after his arrest of his Miranda rights, and that this omission violated his Fifth Amendment right against self-incrimination. See Miranda v. Arizona, 384 U.S. 436 (1966).

The trial judge issued a written order denying the Defendant's motion to suppress his statements concerning ownership of the Taurus gun and that he lacked a permit for possession of the weapon. Initially, the judge found that Mancillas waived the Fifth Amendment argument because he had "not previously asserted any Fifth Amendment claims whereby he might have sought to suppress certain statements [he] allegedly made to the police officers at the time of or incident to his arrest for which Miranda warnings had not been provided." The judge concluded that "any such Fifth Amendment claims [have] been waived by Defendant's failure to assert them in a timely and complete fashion prior to the conclusion of the evidentiary hearing." As an alternative to the finding that Mancillas waived his Miranda arguments, the court found that Mancillas' statements admitting ownership of the gun and his failure to obtain a permit were made prior to Mancillas' arrest and prior to any "custodial interrogation."

At trial, during the government's examination of Officer Cook, the Assistant United States Attorney ("AUSA") posed a series of inquiries to Cook regarding the questions he had asked the suspects while in the parking lot. Mancillas' counsel objected on Fifth Amendment grounds to Cook advising the jury of Mancillas' response to Cook's inquiry "who's got the gun" and the trial judge overruled the objection. Mancillas' counsel asked to note a continuing objection on Fifth Amendment grounds, and the court agreed to note a continuing objection. In the absence of the jury, the judge enumerated further reasons for her decision to admit the testimony regarding the Defendant's statements. She reiterated that Mancillas had "untimely advance[d]" his Fifth Amendment argument and thus she deemed it waived.

The judge alternatively ruled that even absent waiver, she would have denied the motion to suppress the Defendant's statements because: (1) the details of the dispatch were corroborated when Cook arrived on the scene; (2) the suspects exited the Mercedes in a suspicious fashion; (3) Cook observed a firearm on the dashboard above the steering wheel; (4) the detention of the suspects lasted no longer than was necessary to verify Cook's suspicions and thus was limited in its intrusiveness; and (5) Cook had returned his revolver to its holster at the time Mancillas made the challenged statements. According to the court,

even though Officer Cook did pull his firearm in order to secure the compliance of the three suspects when he ordered them to return to their vehicle and place their hands on the hood of the vehicle[, this] did not amount to a custodial stop. It was a brief restriction of their liberty. It was for a valid investigative purpose. The officer had reasonable suspicion to investigate, and he has testified that he did not place any of the Defendants under arrest until after he had established that there was no firearm permit. . . . The conduct of Officer Cook was neither coercive nor intimidating under those circumstances. And . . . the scope of the detention did not exceed Terry standards so as to become a custodial interrogation. And the restriction on [Mancillas'] liberty . . . was brief both in terms of the time it required and the extent of the intrusion.

For all of these reasons, the court found that a Miranda warning was not required and thus Mancillas' statements were admissible.

D. The Jury Trial, the Verdict Finding Mancillas Guilty of Counts One, Three and Five as Charged in the Indictment, and the Sentence Imposed by the District Court.

Mancillas' jury trial commenced on September 15, 1997, with Patrolmen Cook and Lopossa summarizing the testimony they had given at the suppression hearing, detailing the events and circumstances leading to Mancillas' arrest. Chuckie Hardman and James Marshall, the men arrested with Mancillas in the early morning hours of December 17, 1996, also testified on behalf of the government, as did Jack Kirk (an acquaintance of Mancillas), as well as DEA Special Agent Thomas Casey.

Hardman testified that he met Mancillas for the first time on December 16, 1996, the day before Mancillas was arrested by Officer Cook. On the evening of December 16, Hardman was at the Club when Mancillas arrived, and while the two men

enjoyed a beer together, Hardman told Mancillas that he was attempting to sell a Raven Arms .25 caliber handgun. The two men, along with James Marshall, walked outside the Club and entered Mancillas' Mercedes. Hardman displayed the Raven Arms handgun to Mancillas but, according to Hardman's testimony, Mancillas did not seem particularly interested in buying it. While the men were discussing whether there was potential for a sale of the Raven Arms handgun, three unknown individuals approached the passenger side of the vehicle and at this time, Hardman testified, Mancillas reached underneath his car seat, grabbed the chrome Taurus handgun, and placed it on his lap. According to Hardman, at that time Mancillas rolled down the passenger window, exposing the Taurus handgun to the three men outside his vehicle, and asked if they "had a problem." The men answered "no problem" and walked away, and according to Hardman, Mancillas then placed the Taurus handgun on the dashboard. Two or three minutes later Officer Cook arrived. Hardman further testified that while he was in the vehicle, he never observed any drugs or drug paraphernalia, nor did anyone attempt to sell him any drugs, but he did recall seeing Marshall and Mancillas exchange a plastic baggie while they sat in the Mercedes, though he was not sure who handed the baggie to whom. Hardman also contradicted Officer Cook's testimony that Mancillas simply handed his car keys to the officer when asked to do so. Hardman explained that after Cook arrived and directed the men to place their hands on their vehicle, Mancillas was required to empty his pockets and lay the contents on the car, at which time Officer Cook acquired the keys to the Defendant's car.

   James Marshall's recollection of events on the night of the arrests was somewhat different. Marshall testified that when he first observed Mancillas, Hardman, and Hardman's girlfriend, they were sitting in Mancillas' Mercedes, smoking something. Everyone went inside the Club, but later that evening Marshall, Hardman, and Mancillas walked outside to the Mercedes. Marshall stated that while the three of them were sitting in the vehicle, Mancillas gave Marshall an undisclosed amount of cocaine wrapped in a baggie and told him to deliver it to a woman inside the Club, and subsequently this cocaine was found on Marshall at the time of his arrest.

   Marshall also stated that earlier in December 1996, Mancillas had directed him to fly to Brownsville, Texas, to pick up two suitcases of marijuana (approximately forty-eight pounds), and transport it to Indianapolis on a commercial airline. Mancillas paid for Marshall's plane ticket, and after he returned, Mancillas ordered

him to transport one of the marijuana-filled suitcases to an unidentified person's home and to deliver the other marijuana suitcase to Mancillas' garage. When Marshall arrived at Mancillas' home with the marijuana, Marshall witnessed Mancillas and his cohort "Lefty" repackage the drugs into ziplock bags presumably for sale in smaller quantities. Marshall testified that he believed a portion of the marijuana ended up in the trunk of Mancillas' car, and was discovered when the men were arrested at the Club on December 17, 1996.

Finally, Marshall testified that following the arrests, Mancillas made contact with him by telephone and by letter while he was in prison. In each of the communications, Mancillas requested Marshall to give false testimony to the IPD and to claim that he (Marshall) possessed the Taurus .40 caliber handgun on the night of the arrests.

Jack Kirk, an acquaintance of Mancillas, was another trial witness. Kirk testified that he was the owner of the Taurus handgun, and that Mancillas had asked to borrow the gun on the night of his arrest. Kirk further stated that Mancillas told him he wanted to borrow the gun because "[h]e was going to a neighborhood where Hispanics [were not] especially liked[,]" and Kirk admitted that he loaned the gun to Mancillas. Kirk further testified that following Mancillas' arrest, Mancillas asked him to falsely inform the IPD that Kirk had borrowed Mancillas' Mercedes and that he (Kirk) had accidentally left the Taurus handgun inside the vehicle.

The government's final trial witness was Special Agent Thomas J. Casey of the Drug Enforcement Administration ("DEA"). On direct examination, Casey began by recounting his career as a drug enforcement officer and recited his qualifications as an expert witness in the drug trafficking business. He described the "tools of the drug trade," and explained that plastic baggies, scales, pagers, guns, and money are the primary instruments of a drug enterprise. Specifically, he stated that drug traffickers often carry weapons for protection against other individuals who may seek to separate the trafficker from his stash, and also "for protection against the police when [they] come in to arrest you or serve a search warrant"-- in other words, guns are used to resist officers attempting to serve warrants or make an arrest. Casey also testified about the definition of a "source city" in the drug trade, and explained it as a city where illegal drugs originate before being transported to other American cities.

Following this general background testimony regarding the drug trade, the AUSA asked Casey to respond to a hypothetical question and he asked Casey to presume that officers found in a vehicle over 400 grams of marijuana and various drug-related paraphernalia including scales, plastic baggies, guns, two pagers, a cellular telephone, and $2440 in currency. The AUSA then asked "[k]nowing these factors, could you give us an opinion as to whether that marijuana was being held for distribution or for personal consumption?" Mancillas' counsel objected, arguing that the anticipated questioning should not be directed at the issue of Mancillas' guilt or innocence with respect to his intent to distribute the illegal drugs. The judge overruled Mancillas' objection. Agent Casey proceeded to testify that based on the facts presented by the AUSA, "[m]y opinion is it's for distribution." On cross-examination, Casey further testified that based on his experience, any amount of marijuana exceeding one-quarter of a pound would be held for distribution rather than personal consumption.

On September 18, 1997, following the three-day trial, the jury convicted Mancillas of three of the five counts charged in the Indictment: Count One (felon in possession of a firearm); Count Three (possession of marijuana with intent to distribute); and Count Five (knowingly carrying a firearm while in possession of marijuana with intent to distribute). The jury was unable to reach a verdict on Counts Two and Four (cocaine possession charges), and those counts were dismissed by the court upon motion of the government.

On December 17, 1997, Mancillas was sentenced to a 180-month term of imprisonment and a three-year term of supervised release, and ordered to pay an assessment of $300. The trial judge made clear that she believed Kirk's testimony that Mancillas asked Kirk to testify falsely and tell the IPD that Kirk had borrowed Mancillas' Mercedes and accidentally left the Taurus handgun in the vehicle. The judge further found that Mancillas' attempts to persuade Kirk to fabricate a story to avoid punishment for carrying the gun constituted obstruction of justice, and gave Mancillas a two-level enhancement on each of Counts One and Three.

Mancillas asked the court to grant him a two-level downward departure for acceptance of responsibility, contending that because he had admitted to Officer Cook that the Taurus handgun belonged to him, and prior to trial had also admitted to owning the 420 grams of marijuana found in his trunk, he was entitled to the

reduction. The judge denied the Defendant's request, finding that Mancillas admitted ownership of the marijuana in a proffer he made to the government under a letter of immunity, and because the admission was made in this protected setting, it did not reduce the government's obligation to prove up each and every element of the case against Mancillas at trial. Moreover, the court also found that "these concessions . . . were not enough . . . to constitute an acceptance of responsibility."

After factoring in the enhancement for obstruction of justice, Mancillas' adjusted offense level on Count Three was 28, and the total offense level upon which the judge based the sentence was 28. Mancillas' criminal history category was IV. Based on these factors, the guidelines recommend a term of imprisonment ranging from 110-137 months on Counts One and Three, plus 60 months mandatory for Count Five (knowingly carrying a firearm while in possession of marijuana with intent to distribute), as well as 2-3 years of supervised release. Based on these factors, the judge sentenced Mancillas as follows: Count One, 120 months in prison; Count Three, 60 months in prison to be served concurrent to the sentence imposed on Count One; and Count Five, 60 months in prison to be served consecutive to the sentences imposed on Counts One and Three. In addition to the total 180-month term of imprisonment, the court sentenced the Defendant to a term of three years supervised release, and ordered that he pay an assessment of $300. Mancillas appeals.

ISSUES

Whether the district court:

(1) improperly denied Mancillas' written motion to suppress physical evidence seized from his Mercedes on the night of the arrest after finding that the original stop and detention of the Defendant, as well as the subsequent search of his vehicle, were constitutionally permissible;

(2) incorrectly denied the Defendant's oral motion to suppress statements he made to Officer Cook on the night of his arrest;

(3) abused its discretion when it permitted DEA Agent Casey to offer an expert opinion on whether, under the circumstances of the AUSA's hypothetical, Casey believed that marijuana was being used for distribution rather than personal consumption;

(4) gave an erroneous jury instruction on Count Five, the charge of "knowingly carrying a

firearm during and in relation to a drug trafficking offense"; or

(5) erred in enhancing Mancillas' sentence for obstruction of justice under USSG sec. 3C1.1 and denying a downward departure for acceptance of responsibility under USSG sec. 3E1.1.

DISCUSSION

I. Did the court improperly deny Mancillas' written motion to suppress physical evidence seized on the night of the arrest?

The Defendant argues that Patrolman Cook's stop of Mancillas and subsequent search of his vehicle infringed upon his Fourth Amendment rights against unreasonable searches and seizures, in that Cook lacked a "reasonable suspicion" to perform an investigatory stop upon Mancillas, Hardman, and Marshall after they exited the Mercedes. Despite all the facts and circumstances therein present, the Defendant further argues that the officers' subsequent search of the interior and trunk of the Mercedes, and attendant seizure of drug paraphernalia and firearms, constituted an impermissible search and seizure. The Defendant's argument continues and concludes that the district court's denial of his written motion to suppress the physical evidence found in his vehicle--the guns, the crack pipes, the cocaine, the marijuana, the screens, etc.--was improper.

The determinations of reasonable suspicion and probable cause to search or seize are reviewed de novo. See Ornelas v. United States, 517 U.S. 690, 697 (1996); United States v. Walden, 146 F.3d 487, 490 (7th Cir. 1998). Factual findings are reviewed for clear error, see Walden, 146 F.3d at 490, and this Court will not substitute its judgment for that of the district court if there is support in the record for the trial court's findings of fact. See United States v. Marshall, 79 F.3d 68, 69 (7th Cir. 1996).

A. The Investigatory Stop of Mancillas.

Initially, we address whether Officer Cook's initial stop and temporary detention of Mancillas, which occurred after the Defendant and his companions exited their car and were walking away, falls within the permissible parameters of the Fourth Amendment. After Cook arrived on the scene and the suspects exited the car each walking in different directions, Patrolman Cook commanded the Defendant-Appellant to stop and return to his vehicle. Initially, we note that the officer's order to stop constitutes a

"seizure" for Fourth Amendment purposes, for "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry, 392 U.S. at 16. But "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." Elkins v. United States, 364 U.S. 206, 222 (1960).

Two categories of seizure implicate the Fourth Amendment: an investigative stop and an arrest. See United States v. Adebayo, 985 F.2d 1333, 1337 (7th Cir. 1993); United States v. Withers, 972 F.2d 837, 841 (7th Cir. 1992). Investigative stops (referred to as Terry stops) are by their very nature brief, and allow "police officers the chance to verify suspicions that the person has been, is, or is about to engage in criminal activity." United States v. Griffin, 150 F.3d 778, 783 (7th Cir. 1998) (citing United States v. Rivers, 121 F.3d 1043, 1045 (7th Cir. 1997)). In Terry, the Supreme Court explained that officers have authority

[to conduct] a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

Terry, 392 U.S. at 27 (citations omitted).

Thus, a law enforcement officer may stop an individual if "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," id. at 21, and support a reasonable suspicion that "criminal activity may be afoot." Id. at 30. Reasonable suspicion requires less than the quantum of proof constituting probable cause. See id. at 21-22; Sokolow, 490 U.S. at 7 (citation omitted); Terry, 392 U.S. at 21-22.

In making this assessment, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in

the belief' that the action taken was appropriate?" Terry, 392 U.S. at 21-22; see also Griffin, 150 F.3d at 783. In order to determine whether reasonable suspicion existed, we examine "the totality of the circumstances--the whole picture[.]" United States v. Cortez, 449 U.S. 411, 417 (1981) (emphasis added). We bear in mind that "[t]he process does not deal with hard certainties, but with probabilities." Id. at 418. The real issue "is whether the police conduct-- given their suspicions and the surrounding circumstances--was reasonable." United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994) (citing Terry, 392 U.S. at 19-20).

Thus, applying the totality of circumstances test, we must determine whether Officer Cook had reasonable suspicion to stop and momentarily detain Mancillas in the early morning hours of December 17, 1996. Mancillas argues that it is "critical" that "the [radio] dispatch did not describe, and Cook did not observe, any definite wrongdoing in progress." He contends that a radio call which fails to describe wrongdoing in progress does not rise to the level of providing police officers with reasonable suspicion that criminal conduct has occurred, was occurring or was about to occur, and consequently, Cook lacked reasonable suspicion to believe that criminal activity was afoot. Mancillas relies on two cases, United States v. Packer, 15 F.3d 654 (7th Cir. 1994), and United States v. DeBerry, 76 F.3d 884 (7th Cir. 1996), in support of his position that the radio dispatch did not provide Cook the requisite degree of reasonable suspicion to make the stop.

In Packer, police responded to a citizen's telephone call reporting a "suspicious vehicle," described by the citizen as a yellow Cadillac with four black male occupants, parked alongside a residential street at one o'clock in the morning. Packer, 15 F.3d at 655. Three police, in two police vehicles, arrived on the residential street just moments later, and found what they described as a "greenish" Cadillac with fogged over windows. See id. Two officers in a police van parked their vehicle behind the yellow-green Cadillac and activated their "take down lights," while the third officer pulled his police cruiser in front of the Cadillac to prevent it from leaving. The three officers approached the Cadillac, and as one of the occupants exited through a rear door of the car, an officer saw a dark, pipe-shaped object protruding approximately two inches from the suspect's knee-length coat. See id. at 655-56. The officers believed the object was a gun, and one officer reached into the man's coat and grabbed the object. See id. at 656. Thereafter, the individual previously in

possession of the gun--Packer--was charged with being a felon in possession of a firearm in violation of 18 U.S.C. sec. 922(g)(1).

Defendant Packer moved to suppress evidence of the firearm arguing that the investigatory stop violated his Fourth Amendment rights because the officers lacked a "reasonable and articulable suspicion" that criminal activity was afoot as required by Terry, 392 U.S. 1. The district court denied the motion to suppress, finding that the citizen's report, the lateness of the hour, and the fogged car windows provided the officers with sufficient justification to make the initial stop. See Packer, 15 F.3d at 656. We reversed, holding that even though the citizen's report described the Cadillac and its location, the mere fact that "four men [were] sitting together in a parked car at the wee hours of the morning" did not constitute sufficient grounds for a "reasonable and articulable suspicion" to believe that criminal activity was afoot. Id. at 658-59. As a result, we reversed the Defendant's conviction because the evidence seized during the encounter should have been suppressed. See id. at 659. Mancillas argues that his case is similar to Packer, and thus Officer Cook lacked a reasonable suspicion to stop him. We disagree.

While Packer is marginally instructive, the facts in that case are distinguishable from the case sub judice, and thus Packer falls short of governing our determination. In Mancillas' case, Patrolman Cook received a 1:35 a.m. radio dispatch reporting that a Hispanic male had just been observed holding a gun while sitting inside a blue Mercedes in the parking lot of the "Hot's Show Club" at 1:30 a.m. Cook pulled into the Club parking lot and a number of the details which had been relayed in the radio dispatch were immediately corroborated. That is, Cook observed a dark blue Mercedes in the Club's parking lot, and three men--including one of Hispanic origin-- exited the car. In addition, two suspicious facts emerged: first, it was certainly unusual to observe three men sitting in a vehicle in a nightclub parking lot in the middle of a wintry, snowy, blustery night at 1:30 a.m.; second, the three occupants of the car exited as soon as Officer Cook arrived in his squad car and focused his spotlight on the Defendant's vehicle, and at this time each of them proceeded to walk in different directions probably in an attempt to avoid contact with the police and to make it more difficult for one officer to apprehend the three of them, with only one of the men (Hardman) walking toward the Club.

Unlike the radio dispatch in Mancillas' case, the citizen's call in Packer simply reported four

men sitting in a car parked in a residential area late at night, and made no mention whatsoever of weapons. In Mancillas' case, the dispatcher reported a Hispanic male with a firearm in his hand, sitting in his Mercedes parked in a nightclub parking lot at 1:30 a.m. on a cold, snowy night. In addition, the four occupants of the Cadillac in Packer did not engage in any sort of elusive or unusual behavior upon arrival of the police--they simply sat in their car. In the instant case, however, as soon as Officer Cook arrived on the scene, and prior to any questioning by the police, Mancillas and his cohorts quickly exited the vehicle and each walked in different directions.

The fact that the citizen's report noted that an individual (later identified as Mancillas) possessed a firearm, as well as the suspicious behavior (walking in different directions) exhibited by the suspects when Patrolman Cook arrived at the Club, added to the officer's reasonable suspicion. See United States v. Duguay, 93 F.3d 346, 351 (7th Cir. 1996) (reasonableness of police officer's suspicions is buttressed by suspect's elusive behavior in turning off road in order to avoid police roadblock); United States v. Lyles, 946 F.2d 78, 80 (8th Cir. 1991) (investigatory stop lawful in part because vehicle occupants acted suspiciously while attempting to drive away). We are persuaded that the presence of a weapon, combined with the suspicious actions of the three suspects in response to Officer Cook's arrival on the scene, and the time of night and weather conditions, distinguish this case from Packer, and Mancillas' argument that Packer governs our result here is unavailing.

Mancillas also relies upon DeBerry, 76 F.3d at 884, which he claims supports his position that "a report of an unnamed individual with a gun does not provide law enforcement officials with the requisite reasonable and articulable suspicion of criminal conduct to conduct a Terry stop." We do not agree that DeBerry helps Mancillas; in fact, we are convinced that DeBerry actually undermines Mancillas' position.

In DeBerry, an officer on afternoon patrol duty received a message from his dispatcher conveying an anonymous tip that a black man in tan shorts and a tan shirt had a gun in his waistband and was standing on a city street corner. See id. at 885. The officer drove to the location and found a man matching the tipster's description, but no gun was visible. See id. According to the officer, the man--DeBerry--took several steps backward, turned slightly to the side, and moved his hands as if he might be about to draw a gun.

See id. The officer drew his revolver and ordered DeBerry to place his hands on the hood of the police car. DeBerry complied, and the officer returned his gun to its holster. A backup officer arrived within two minutes, patted down the suspect, found the gun, and arrested him. See id. DeBerry was charged with being a felon in possession of a firearm in violation of 18 U.S.C. sec. 922(g)(1) and filed a motion to suppress the gun, claiming that the officer lacked probable cause to arrest him until he found the gun, and therefore the seizure of the gun violated the Fourth Amendment. See id. The district court denied the motion to suppress evidence of the gun.

We affirmed, holding that when officers receive an anonymous tip accurately describing an individual and alleging that the individual is armed, even "weak[ ] corroborat[ion]" entitles police to stop the person and search the individual for a gun. Id. at 886. In Mancillas' case, the dispatch received by Officer Cook was corroborated (as explained above), and the other suspicious circumstances, including the time of night, the prevailing weather conditions, and the suspects' decision to exit the vehicle and walk off in different directions, all provided Officer Cook with even more reasonable suspicion to stop Mancillas. As we stated in DeBerry, "[a]rmed people are so dangerous to the peace of the community that the police should not be forbidden to follow up a tip that a person is armed, and as a realistic matter this will require a stop in all cases." Id.

In this case, Officer Cook received a police dispatch stating that a Hispanic male seated in a blue Mercedes had a gun at the Hot's Show Club parking lot. Upon Cook's arrival at the parking lot, he observed three males quickly exit their car and the details contained in the radio dispatch (a Hispanic male in a blue Mercedes in Club's lot with a gun) were confirmed. Then, the three companions behaved suspiciously by each walking off in a different direction at 1:30 a.m. on a cold, wintry night. We are convinced that the combination of all of these factors gave Cook a "reasonable and articulable suspicion" to believe that "criminal activity may [have been] afoot[,]" Terry, 392 U.S. at 30, and that Mancillas' actions warranted further investigation. Thus, we hold that Officer Cook's actions in stopping Mancillas and his companions from leaving the scene were constitutionally permissible.

B. The Officers' Search of the Interior and Trunk of the Mercedes.

After determining that Officer Cook's Terry stop was justified, the district court found that Officers Cook's and Lopossa's subsequent search of the interior and trunk of the vehicle satisfied Fourth Amendment standards since Cook observed the handgun in plain view on the dashboard of the vehicle and thus had probable cause to search the interior and trunk of the Mercedes, and the court further found that Mancillas consented to the search when he relinquished his car keys. We agree with the district court's conclusion that the search fell within the parameters of the Fourth Amendment.

In Michigan v. Long, 463 U.S. 1032 (1983), the United States Supreme Court faced a similar question regarding the constitutionality of a search of the passenger compartment of an automobile after officers viewed a weapon in the front seat. In Long, two deputies were on patrol in a rural area at midnight when they observed a car traveling erratically and at an excessive speed. See id. at 1035. The vehicle swerved into a ditch, and the deputies stopped to investigate. The driver and sole occupant of the car, Mr. Long, met the deputies at the rear of the car, leaving the driver's door open. See id. at 1035–36. After a deputy asked on three occasions to see Long's operator's license, Long turned from the officers and began walking toward the open door of the vehicle. See id. at 1036. The officers followed Long and both observed a large hunting knife on the floorboard of the driver's side of the car. Upon noticing the weapon, the officers stopped Long's progress and conducted a protective patdown which revealed no weapons on his person. See id.

One of the deputies shined his flashlight into the interior of the vehicle to search for other weapons, but he did not actually enter the car. The officer noticed that something was protruding from under the armrest on the front seat, so he knelt in the vehicle and lifted the armrest. See id. Underneath the armrest, the deputy noticed an open pouch sitting on the front seat, and upon flashing his light on the pouch, determined that it contained marijuana. At that time, Long was arrested for possession of marijuana. See id. The officers searched the trunk and discovered approximately seventy-five pounds of marijuana inside. Long filed a motion to suppress the marijuana taken from the car and the trunk. See id. The trial judge denied his motion, and he was convicted of possession of marijuana.

On review, the Supreme Court considered "the authority of a police officer to protect himself by conducting a Terry-type search of the passenger compartment of a motor vehicle during

the lawful investigatory stop of the occupant of the vehicle." See id. at 1037. In upholding the constitutionality of the search, the Court recognized that:

protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . . and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of a passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible . . . if "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Id. at 1049 (quoting Terry, 392 U.S. at 21).

In reaching this result, the Court relied on New York v. Belton, 453 U.S. 454, 460 (1981), wherein the Court held that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon' . . . ." Id. (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).

Considering the totality of circumstances facing Patrolmen Cook and Lopossa at the time of and immediately prior to Mancillas' arrest, we hold that the officers certainly had reason to have a reasonable fear for their safety and were within their authority to conduct a search of the parties and the vehicle. The police officers had information that a Hispanic male seated in a car parked in a nightclub parking lot was observed with a revolver in his hand; when Officer Cook arrived, there was a gun sitting in plain view on the dashboard of the Mercedes from which a Hispanic male had just exited; the suspects exited the vehicle and proceeded in different directions obviously attempting to evade contact with police; and Mancillas and the other occupants initially denied that they had a gun in spite of the fact that a gun could be seen on the dashboard of the vehicle in plain view immediately in front of the steering wheel on the driver's side which Mancillas had just exited. Under Michigan v. Long and its progeny, the dashboard of Mancillas' Mercedes fell within "the area into which an arrestee might reach in order to grab a weapon . . .," Chimel, 395 U.S. at 763, and thus the search was constitutional.

This Circuit's decisions also support the

constitutionality of the search performed in this case. In United States v. Holifield, 956 F.2d 665 (7th Cir. 1992), an individual who was stopped by police for speeding exited his vehicle and approached the police officers' unmarked car in a boisterous and aggressive manner. He agreed to cooperate in a search of his person and voluntarily produced his driver's license. See id. at 666. After a patdown search revealed no weapons, the officers looked through the car's tinted windows, observed two passengers seated in the vehicle, and asked them to exit the car; the passengers were frisked but were found not to be carrying weapons. See id. Because it was normal procedure to allow persons to wait in their car while writing a citation, one officer proceeded to search the car interior, removed the keys from the car's ignition, unlocked the glove compartment, and discovered a pistol. See id. at 667. The Defendant admitted ownership of the gun and was arrested and indicted on three federal offenses relating to the illegal possession of a firearm. See id. at 667-68. The Defendant filed a motion to suppress evidence of the gun, arguing that the officers' search was unlawful. See id. at 666.

The district court denied the motion to suppress, and we affirmed, reasoning that "the absence of weapons on the [defendant], and the fact that there was no further aggressive behavior did not, as a matter of law, make continuing apprehension of danger unreasonable." Id. at 668. We disagreed with the Defendant's argument that it was unreasonable to search the locked glove compartment, noting that once the occupants returned to the car, "it would have taken only a few seconds for Holifield or one of his passengers to remove the keys from the ignition and unlock the glove compartment, thus giving them immediate access to the pistol." Id. at 668-69. Finally, we observed that "the Supreme Court has rejected the reasoning that because the occupants have exited the vehicle and are under the control of officers, the officers could not reasonably believe that they could gain immediate control of a weapon located inside the vehicle." Id. at 669 (citing Long, 463 U.S. at 1051).

This Court applied similar reasoning to uphold a protective search in United States v. Brown, 133 F.3d 993 (7th Cir. 1998), cert. denied, 118 S. Ct. 1824 (1998). In Brown, police officers stopped two persons suspected of prowling late at night in a high-crime neighborhood. See id. at 995. After the suspects were removed from their car, an officer scanned the interior of the vehicle with his flashlight and observed a "shiny chrome object" protruding from a black bag and believed it might be a weapon. Id. The officer

opened the bag, and found the chrome object to be a .44 Magnum with a scope attached to the top. The Defendant was indicted and moved to exclude from evidence his possession of the .44 Magnum. See id. at 994-95. The district court admitted the evidence and the Defendant was convicted of three federal offenses relating to his possession of firearms. The Defendant appealed alleging that the search of the bag and seizure of the gun were unconstitutional. See id.

We affirmed, holding that the defendant "was not so far from the car that he could not lunge for a gun inside it, or in the words of the Supreme Court in Michigan v. Long, not so far that he could not have gained 'immediate control of weapons.' 463 U.S. at 1049." Id. at 998. We further held that when the officer observed the shiny chrome object, "the danger posed by the encounter multiplied exponentially," and the officer "had no reasonable choice other than to open the bag." Id. at 999. We further concluded that "[t]he fear generated from the 'risk of re-entry' is a reasonable one . . . ." Id. at 998 (citing Holifield, 956 F.2d at 668-69).

In the instant case, the following facts bear upon our determination dealing with the question of whether Cook had reasonable suspicion to make the Terry stop and protective search in light of his concerns for his safety. Initially, we note that after Officer Cook had directed the suspects to place their hands on the hood of the Mercedes, Cook looked into the car and confirmed that a revolver was on the dashboard of the automobile. In addition, the police radio dispatch reported that a Hispanic male was holding a gun while seated in a blue Mercedes in the Hot's Show Club parking lot, and when Cook arrived, the details relayed in the dispatch were confirmed because Mancillas, a Hispanic male, was found exiting the blue Mercedes and Cook reasonably could have believed that Mancillas was carrying the gun mentioned in the dispatch. Further, when Cook first detained the three individuals, he was the only officer on the scene and feared that when they walked in different directions they would surround him "in some type of triangulation." Under the totality of the circumstances, and in light of Supreme Court and Seventh Circuit precedent, we are convinced that the officers were entitled to search the interior of the car to ensure their own safety, and the search was within the confines of the Fourth Amendment.

Because both the investigatory stop and the subsequent search of the Mercedes were constitutionally permissible within the parameters of the Fourth Amendment, we hold that the district court's denial of Mancillas' motion

to suppress the physical evidence seized on the night of his arrest was proper.

II. Whether the trial judge abused her discretion when she denied Mancillas' oral motion to suppress statements Mancillas made to Officer Cook on the night of his arrest.

Mancillas next contends that statements he made to Officer Cook should have been suppressed at trial because Cook failed to advise Mancillas of his Miranda rights prior to the time Mancillas made the statements. We review de novo the district court's determination that the statements were admissible. See United States v. James, 113 F.3d 721, 727 (7th Cir. 1997); United States v. Yusuff, 96 F.3d 982, 988 (7th Cir. 1996). Any "historical" facts and credibility determinations are reviewed deferentially under the clear error standard. Yusuff, 96 F.3d at 988 (citing Thompson v. Keohane, 516 U.S. 99, 111 (1995), and Ornelas, 517 U.S. at 699).

The statements admitted at trial of which Mancillas complains are: three responses of "no" to Officer Cook's question (asked three times) "who had a gun"; his admission that there was a gun in the car; and his later admission that he lacked a permit for the gun. Officer Cook posed the questions regarding (1) "who had a gun" and (2) whether there was a gun in the car after stopping the three men and directing them to return to the vehicle with their hands on the hood of the car. At the time these questions were asked, Cook had arrived on the scene and waited approximately one minute for Lopossa to arrive and also had spotted the Taurus handgun on the dashboard. In addition, Officer Lopossa had finished the patdown search of the suspects, which took approximately another minute or so, and Patrolman Cook had returned his service revolver to its holster and walked ten feet to the Mercedes. Mancillas responded to the questions as stated previously.

Cook attempted to open the car door, requested Mancillas' keys, received the keys, and opened the door. Cook inspected the Taurus handgun and observed drug paraphernalia lying in plain view on the console. Also at this time, Lopossa entered the car and discovered a second gun as well as the drug paraphernalia. Cook testified that at this time, "everyone [was] effectively under arrest" for possession of paraphernalia and controlled substances. Cook proceeded to ask whether any of the companions possessed a permit for the handgun, and Mancillas responded, "No." It is undisputed that neither Officer Cook nor any other officer present at the Club's parking

lot advised Mancillas of his Miranda rights at
any time.

The court ruled that all of Mancillas'
statements dealing with the ownership of the gun
and his lack of a permit were admissible at trial
because the Defendant had waived his Miranda
objection by failing to give notice to the court
and the government that he would object to their
admission, and by failing to actually make any
objection in a timely and complete fashion prior
to the suppression hearing (as noted, Mancillas
failed to object until the Friday before Monday,
in effect the day before trial, even though a
court order required him to file motions to
suppress months earlier). Alternatively, the
court found that the statements "were made prior
to [the Defendant's] being placed under arrest."
Mancillas argues that he preserved his Miranda
objection and that he was the subject of a
"custodial interrogation" when he made the
statements, thus the officers' failure to give
Miranda warnings made his statements
inadmissible.
Initially, we address whether Mancillas waived
his Fifth Amendment objection. On May 29, 1997,
the district court issued an order setting forth
the case schedule, setting the trial for July 21,
1997, and advising the parties that "all MOTIONS
of the parties contemplated by the Federal Rules
of Criminal Procedure shall be filed within 15
days after [the] appearance by the attorney for
the Defendant." On June 4, 1997, the Defendant,
represented by appointed counsel, made his
initial appearance. On June 20, 1997, Mancillas
filed a written motion to suppress the physical
evidence seized (guns, drugs, etc.) on the
grounds that the search and seizure of his car
violated his Fourth Amendment rights. In this
motion, the Defendant failed to seek exclusion,
under Miranda or any other theory, of the
statements he made at the time of his arrest.

Thereafter, on two other occasions, Mancillas
moved for a continuance of the suppression
hearing and trial dates, and the court granted
both motions and reset the dates two separate
times. The suppression hearing was rescheduled
for Friday, September 12, 1997; the trial was set
to begin three days later, on Monday, September
15, 1997. On the day of the suppression hearing,
the Defendant filed a "Supplemental Memorandum"
in support of his motion to suppress, which set
forth his Fourth Amendment arguments to suppress
physical evidence. Like the Defendant's original
motion, the supplemental memorandum failed to
refer to any Fifth Amendment issues or to any
objections regarding the admission at trial of
Mancillas' statements.

Nevertheless, approximately two-thirds of the way through the suppression hearing, defense counsel for the first time objected, pursuant to the Fifth Amendment and Miranda, to the admission of any of Mancillas' statements made in violation of Miranda. The transcript reads as follows:

COURT: [A]re you seeking to suppress statements?

COUNSEL: I have not decided yet, Your Honor. I will know by early afternoon.

COURT: The Court is going to rule promptly, so you may have waived your right to that by not giving the Court sufficient notice.

COUNSEL: We would like to suppress any statements made by Mr. Mancillas that were not in accordance with his Miranda.

COURT: That's just what I'm saying, you may have waived that.

COUNSEL: I understand.

Later during the hearing, the trial judge ruled that Mancillas had indeed waived his Fifth Amendment objections because he failed "to provide notice of any intention to suppress evidence under the Fifth Amendment, and so that claim, if it ever was intended to be asserted, has been waived . . . ."

Federal Rule of Criminal Procedure 12(b) requires that motions to suppress evidence be raised prior to trial. See United States v. Krankel, 164 F.3d 1046, 1051 (7th Cir. 1998). The court may, however, set a time for the making of pretrial motions. See Fed. R. Crim. P. 12(c). "Failure by a party to raise defenses or objections . . . which must be made prior to trial [or] at the time set by the court pursuant to subdivision (c) . . . shall constitute waiver . . . ." Fed. R. Crim. P. 12(f). Moreover, a defendant who fails to file a motion to suppress evidence in the trial court waives his right to appellate review of the issue. See Krankel, 164 F.3d at 1051 (citing United States v. Smith, 80 F.3d 215, 218 (7th Cir. 1996)).

The Defendant argues that there was no waiver, and thus we should review his Fifth Amendment and Miranda arguments on the merits. We disagree. The case sub judice is similar to United States v. Hamm, 786 F.2d 804, 806 (7th Cir. 1986), wherein the court issued an "Order for Pretrial Discovery and Inspection direct[ing] that motions be filed within fifteen (15) days of the arraignment." Id. The Defendant failed to file the motion within the allowable fifteen day period, and thereafter

moved to suppress a co-defendant's statements under Miranda pursuant to the Fifth Amendment. See id. The court denied the motion ruling that it was untimely filed, and we affirmed. See id.

Similarly, in United States v. Knezek, 964 F.2d 394, 397-99 (5th Cir. 1992), the Defendant moved to suppress evidence after expiration of the deadline for pretrial motions set by the court. The trial judge ruled that the Defendant waived his right to challenge the evidence, and the Fifth Circuit agreed, holding that
[a] district court does not abuse its discretion under Rule 12(f) in denying a suppression motion solely on the grounds that the defendant failed to comply with pretrial procedures. [The Defendant] unquestionably failed to comply with Rule 12 and the local rules [which permitted the judge to set the cut-off date for pretrial motions, including motions to suppress evidence].

Id. at 397. See also United States v. Bullock, 590 F.2d 117, 120 (5th Cir. 1979) (noting "the district court would not have abused its discretion under Rule 12(f) if it had denied defendant's various suppression motions relying solely on defendant's failure to comply with pretrial procedures.")

Mancillas failed to file a motion to suppress his statements within the mandatory fifteen day period set by the court in its order governing the case proceedings. Moreover, the Defendant waited until the Friday before Monday's trial to raise the issue for the first time. Under these circumstances, we agree with the court's decision that Mancillas waived his right to argue that his statements were inadmissible under Miranda. As such, the court properly admitted them.

III. Whether the district judge abused her discretion when she permitted DEA Agent Casey to offer an expert opinion that under the hypothetical circumstances presented by the AUSA, the 420 grams of marijuana was intended for distribution rather than personal consumption.

Count Three of the Indictment, charging Mancillas with possession with intent to distribute marijuana, is a specific intent crime which required the jury to find that the Defendant possessed the marijuana and that he intended to distribute the marijuana. See United States v. Lewis, 110 F.3d 417, 420 (7th Cir. 1997); U.S. v. Cea, 914 F.2d 881, 887 (7th Cir. 1990). In order to establish that Mancillas intended to distribute the 420 grams of marijuana found in the trunk of his Mercedes, the government called DEA Special Agent Casey as an expert witness at trial. Casey commenced his

testimony with a recitation of his qualifications and testified that early in his law enforcement career he spent nine and one-half years with the Indianapolis Police Department, including five years in the narcotics and dangerous drugs division. Over the course of his employment with the IPD and the DEA, Casey was involved in excess of 2000 controlled substance investigations.

Following his work as an officer with the IPD, Casey accepted a position with the DEA, and just before joining the DEA, he received specialized training and education regarding the enforcement of federal laws regulating controlled substances. Casey testified that he has spent the past nineteen years as a special agent with the DEA and was recently promoted to a supervisory position within that Agency.

After stating his qualifications, Casey proceeded to describe the items that, based upon his experience, constitute the "tools of the trade" in the world of drug trafficking. Finally, Casey explained what the term "source city" means in common drug parlance, namely a city from which drugs originate for distribution to satellite cities.

The AUSA proceeded to question Casey as follows: "Special Agent Casey, let me ask you this hypothetical question concerning evidence that's been developed in this case outside of your presence." Mancillas objected to the hypothetical on the grounds that it was impermissible for Casey to testify to the Defendant's guilt or innocence, and that the prosecution should not be permitted to show Casey the actual exhibits in the Defendant's trial (for instance, the photograph of marijuana with a note bearing the notation "420 g") and then ask, "do you think they were drug dealing[,]" because according to the Defendant, "that invades the province of the jury." After permitting the AUSA to explain the hypothetical outside the presence of the jury, the judge overruled the Defendant's objection finding that the hypothetical, as framed, did not amount to the prosecutor asking Agent Casey to state whether these particular defendants were dealing drugs. The AUSA continued her questioning, asking "[i]f I told you the following facts, could you please tell me if you have an opinion as to what may or may not have been occurring in terms of distribution or nondistribution on a given evening [?]" The AUSA then proceeded to offer a "hypothetical" which required Casey to assume the following facts: that 400 grams of marijuana were found in a clear plastic baggie which also contained a slip of paper bearing the notation "420g"; that within the vicinity of the marijuana was also found a

handgun, a scale, two pagers, a cellular phone, and $2440 in currency, primarily in $100 bills. The AUSA then showed Casey an exhibit picturing the bag containing the marijuana and the note stating "420G" found in Mancillas' trunk, and the following colloquy occurred:

AUSA: Knowing those factors, could you give us an opinion as to whether that marijuana was being held for distribution or for personal consumption?

Casey: Yes, ma'am. I could.

AUSA: Okay. Could you tell the jury what your opinion is?

Casey: My opinion is that it's for distribution.

Agent Casey further testified that based on his extensive experience, one-half to three-quarters of a pound of marijuana would be for distribution because a person using this amount of marijuana for personal consumption would have to smoke thirty to thirty-five joints per day.

On appeal, Mancillas contends that the district court's decision to admit Casey's response to the hypothetical violated Federal Rule of Evidence 704(b), because the opinion constitutes "ultimate issue" testimony (it is an opinion on the "ultimate issue" of the Defendant's intent to distribute, an element of the crime charged). On review, we give great deference to the district court's evidentiary rulings, and will reverse the admission of Casey's testimony "only upon a showing that the district court committed a clear abuse of discretion." United States v. Brown, 7 F.3d 648, 651 (7th Cir. 1993) (internal quotation marks omitted).

Rule 704(b) states as follows:

No expert witness testifying with respect to the mental state . . . of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged. . . . Such ultimate issues are matters for the trier of fact alone.

Fed. R. Evid. 704(b). The parties agree, and we have held, that Rule 704(b) applies to the expert testimony of law enforcement officers. See, e.g., United States v. Willis, 61 F.3d 526 (7th Cir. 1995); United States v. Lipscomb, 14 F.3d 1236 (7th Cir. 1994); United States v. Brown, 7 F.3d 648 (7th Cir. 1993). In Lipscomb, 14 F.3d at 1242, we explained that:

[W]hen a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes.

In making this determination, a relevant factor is the degree to which the expert witness states, and/or specifically refers to, the intent of the defendant, because this might conceivably suggest that the expert's opinion "is based on some special knowledge of the defendant's mental processes." Id. at 1243.

Mancillas contends that neither the AUSA's direct examination or the district court judge made it clear to the jury that Casey was not attempting to infer that he had special knowledge of the Defendant's mental processes. The government, on the other hand, responds that the nature of the AUSA's examination "apprise[d] the jury that Agent Casey's opinion was based solely on his knowledge of common criminal practices, rather than on any personal knowledge of Mancillas or the circumstances of his case."

We agree with the government that the AUSA's examination, taken as a whole, apprised the jury that Agent Casey's opinion was based on his knowledge of criminal practices generally, and not on some special knowledge of Mancillas' mental processes. See Fed. R. Evid. 704(b). To begin with, prior to the hypothetical, every one of the AUSA's questions dealt with Casey's experience, training and knowledge of drug trafficking enterprises. He testified about his personal knowledge and experiences, about common "tools of the trade" in the drug trafficking business, and he distinguished between source cities and satellite cities. Throughout the AUSA's direct examination, there was absolutely no discussion of the facts involved in Mancillas' case. In addition, as the government makes clear in its brief, Mancillas' name was not even mentioned during the direct examination, including during the hypothetical posed by the government. And, our review of the trial transcript reveals that Agent Casey neither testified nor purported to have knowledge of Mancillas' mental processes. Furthermore, it is interesting to note that Agent Casey never referred to the terms "intent" or "intended," the words directly triggering application of Rule 704(b). See Brown, 7 F.3d at 653 n.2 ("It is only the expert's use of the word 'intended' that

implicates the rule.").

We conclude that Agent Casey based his opinion on his knowledge of the drug trade rather than on any alleged or conceived familiarity with the working of Mancillas' mind. See Lipscomb, 14 F.3d at 1243. The district judge acted within her discretion when she admitted Casey's opinion over Mancillas' objection.

IV. Whether the district court's jury instruction on Count Five, the charge of "knowingly carrying a firearm during and in relation to a drug trafficking offense," was erroneous.

Mancillas next complains about the jury instructions detailing the elements of the crime charged in Count Five of the Indictment, which charged that on or about December 17, 1996, Mancillas "did knowingly carry a firearm during and in relation to a drug trafficking crime . . . in violation of Title 18, United States Code, Section 924(c)(1)." We review a trial court's instructions to the jury with great deference. See United States v. Kelly, 167 F.3d 1176, 1178 (7th Cir. 1999) (citation omitted). When conducting this deferential review, we note that more frequently than not litigants rephrase and reframe the testimony to their benefit and take jury instructions out of context when making their appellate arguments. Thus, we analyze the instructions as a whole and not piecemeal to determine if they are accurate statements of the law. See id.; United States v. Liporace, 133 F.3d 541, 545 (7th Cir.), cert. denied, 118 S. Ct. 1823 (1998). The instructions given by the court must be accurate statements of the law that are supported by the facts in the case. See United States v. Perez, 43 F.3d 1131, 1137 (7th Cir. 1994). We consider whether the court's jury instructions misled the jury and whether the jury had an understanding of the issues. See id. (citations omitted). "As we have stated before, instructions 'which are accurate statements of the law and which are supported by the record will not be disturbed on appeal.'" United States v. Vang, 128 F.3d 1065, 1069 (7th Cir. 1997) (citation omitted). Moreover, even an erroneous instruction will be reversed "only if the jury's comprehension of the issues is so misguided that it prejudiced the complaining party." Id. (quoting United States v. Smith, 103 F.3d 600, 606 (7th Cir. 1996) (other quotation omitted)).

Mancillas acknowledges that Count Five of the Indictment charged him with "knowingly carrying a firearm during and in relation to a drug trafficking crime" in violation of 18 U.S.C. sec. 924(c)(1), and he argues that the court's instructions on that count were erroneous.

Mancillas alleges that the trial court (1) gave an erroneous definition of the phrase "during and in relation to"; (2) erroneously defined the term "carry"; and (3) failed to expressly instruct that the gun must "knowingly" be carried to warrant a conviction.

Initially, Mancillas alleges that the court's instructions on the meaning of the phrase "during and in relation to" misstated the law. The instructions stated that the phrase should be "interpreted in accordance with its plain meaning, which could include that the firearm facilitated or had the potential of facilitating the drug trafficking offense." We are of the opinion that the instruction correctly summarizes the state of the law as applied to the facts of this case, thus we can summarily dispose of Mancillas' argument. In Wilson v. United States, 125 F.3d 1087, 1093 (7th Cir. 1997), this Circuit held that "[i]n order for a firearm to satisfy the 'in relation to' prong of the offense it must at least 'facilitat[e], or ha[ve] the potential of facilitating' the drug trafficking offense." (quoting Smith v. United States, 508 U.S. 223, 238 (1993)) (other quotation omitted). Contrary to Mancillas' claims, and as illustrated by Wilson, the district court's instruction defining "during and in relation to" was precisely in line with the precedent of this Circuit.

Second, Mancillas contends that the court erred when it defined "carrying" as "ha[ving] its ordinary meaning which includes, among other things, to 'transport' a firearm." Mancillas' argument rests on his notion that Bailey v. United States, 516 U.S. 137 (1995) provides the controlling definition of "carrying" for purposes of sec. 924(c)(1). He claims that the Supreme Court in Bailey "require[d] that a firearm be actively employed in a way directly connected with a drug trafficking offense," and that "the inert transportation of a firearm while a drug trafficking offense is occurring is not enough to meet this test." We disagree. In Bailey, the Court "granted certiorari to clarify the meaning of 'use' under 924(c)(1)." Id. at 142. The Court clearly distinguished between the "use" and "carry" prongs of Section 924(c)(1), and noted that "Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning." Id. at 146. The Court proceeded to hold that "a conviction under the 'use' prong" of 924(c)(1) requires proof "that the defendant actively employed the firearm . . . ." Id. at 150. Here, Mancillas was not charged with "using" a firearm, only with "carrying" a firearm. Thus, Bailey is not the touchstone for the district court's instructions on the elements of "carrying" a firearm.

A better guide is Muscarello v. United States, 524 U.S. 125, 118 S. Ct. 1911 (1998), which unlike Bailey, addresses the "carry" prong of 924(c)(1). In Muscarello, the United States Supreme Court stated as follows:

The question before us is whether the phrase "carries a firearm" is limited to the carrying of firearms on the person. We hold that it is not so limited. Rather, it also applies to a person who knowingly possesses and conveys firearms in a vehicle . . . which the person accompanies.

118 S. Ct. at 1913-14. The Court proceeded to hold that guns locked in a glove compartment or kept in the trunk of a vehicle satisfy the "carry" prong of sec.924(c)(1), id. at 1914, further demonstrating that Mancillas' argument, that "carrying" a firearm requires "active employment" of the weapon, is misguided.

We have considered the meaning of "carry" as used in sec. 924(c)(1) in United States v. Molina, 102 F.3d 928 (7th Cir. 1996). There, we stated that

[t]he relation between the firearm and the drugs-- which is, after all, the core of the offense-- is best established by their relation to each other, and not by the distance between owner and gun at the moment of arrest . . . . a gun does not have to be within a defendant's immediate reach.

Id. at 932. Moreover, in United States v. Baker, 78 F.3d 1241, 1247 (7th Cir. 1996), we explicitly defined the term "carry" to mean "to move while supporting: Transport." (citing Merriam-Webster's Collegiate Dictionary 175 (10th ed. 1993)). "[I]t is the possession of the firearm coupled with the affirmative act of transporting it during and in relation to a drug trafficking crime that precipitates liability under sec. 924(c)(1)." Id. We are convinced that the trial court did not mislead the jury in any way by defining "carrying" as "having its ordinary meaning which includes, among other things, to 'transport' a firearm," and by not requiring the jury to find that Mancillas "actively employed" the firearm.

Finally, Mancillas believes that the trial court erred by failing to expressly instruct the jury that the gun must be carried "knowingly" before a conviction is warranted under sec. 924(c)(1). Mancillas failed to object, either at trial or at the instructions conference, to the district court's alleged failure to include a separate "knowledge" instruction. As such, his argument is waived absent plain error. See United States v.

Douglas, 818 F.2d 1317, 1320 (7th Cir. 1987). We have previously held that sec. 924(c)'s "during and in relation to" element, discussed above, encompasses a knowledge requirement. In United States v. Gutierrez, 978 F.2d 1463 (7th Cir. 1992), this Court held that an indictment was not defective for failing to explicitly state the knowledge requirement. We agreed with the district court's conclusion that "[c]learly, a person cannot have possession or control of a firearm and allow the firearm to play a role in the crime unless the person [had knowledge] of the firearm's existence." Id. at 1467. Moreover, even if we were convinced that a separate knowledge instruction was required, there is no plain error because we do not believe that a separate instruction defining "knowledge" would have influenced the verdict. See Douglas, 818 F.2d at 1320 ("Plain error must be of such a great magnitude that it probably changed the outcome of the trial."). The following facts are relevant to our determination. Initially, we note that during Mancillas' trial, Hardman testified that minutes before Officer Cook arrived, Mancillas displayed the Taurus weapon to the three individuals who approached them that cold, snowy and wintery December 17, 1996 night. In addition, Kirk testified that Mancillas borrowed the gun from Kirk the night before Mancillas was arrested (and the court specifically credited Kirk's testimony). Finally, Cook stated that before Mancillas was arrested and after Cook had observed the handgun on the dashboard in front of the very seat where Mancillas was sitting, the Defendant (when questioned a third time) admitted that the handgun in question belonged to him. After examining all of these factors, we are convinced that Mancillas well knew he was carrying the firearm, and any rational jury would have found this to be true. Thus, the trial judge's decision to not include a separate knowledge instruction did not constitute clear error.

Considered in their entirety, the jury instructions on the elements of the crime of "knowingly carrying a firearm during and in relation to a drug trafficking crime" accurately stated the law. We are not persuaded that the jury was misled by the jury instructions in any way, and we are convinced that the jurors had an understanding of the issues presented and the law applicable thereto. See Perez, 43 F.3d at 1137.

V. Whether the trial court erred when enhancing Mancillas' sentence for obstruction of justice under USSG sec. 3C1.1 and denying a downward departure for acceptance of responsibility under USSG sec. 3E1.1.

A. Enhancement for Obstruction of Justice.

Mancillas next contends that the sentencing judge committed error when she enhanced his sentence for obstruction of justice pursuant to USSG. sec. 3C1.1, which states in relevant part:

Obstruction or Impeding the Administration of Justice.  If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation . . . of the instant offense, increase the offense level by 2 levels.

The sentencing judge enhanced Mancillas' base offense levels for Count One (felon in possession of a firearm) and Count Three (possession of marijuana with intent to distribute) by two levels each. We review de novo the district court's application of the guidelines and we review factual findings in the sentencing phase for clear error. See Yusuff, 96 F.3d at 989 (citation omitted).

The sentencing judge found that Mancillas had attempted to obstruct justice by asking James Kirk to falsely claim responsibility for the Taurus weapon found in the Mercedes. The court found that, prior to trial, the Defendant asked Kirk to testify falsely that he had accidentally left the Taurus weapon in the Mercedes when he had borrowed the vehicle from Mancillas. Although Kirk had misstated the facts to an officer early in the investigation, once the trial began and Kirk was placed under oath, he refused to accede to Mancillas' request that he testify falsely and decided to tell the truth, stating that Mancillas had borrowed the gun from Kirk on the evening of December 16, 1997, and that Kirk had never before been in Mancillas' Mercedes.

Mancillas also argues that Kirk is not a credible witness because Kirk changed his statement to law enforcement officers investigating the incident (as described below), and the district judge erred by relying on his testimony as grounds for the obstruction of justice enhancement. Mancillas points out that during the trial, Kirk testified that after Mancillas was arrested, Kirk was approached by law enforcement officers questioning him about the handgun. At trial, Kirk testified that when officers first asked him about his Taurus handgun, he originally stated that the weapon was stolen from his home. It was only after an agent made a follow-up telephone call to Kirk that he told the law enforcement official that he had loaned the gun to the Defendant Mancillas.

It is clear that the trial judge relied on

Kirk's testimony that Mancillas borrowed the Taurus gun from Kirk, and we are unable to discover any reason that would lead us to a conclusion that the court committed clear error when relying upon that testimony. "[W]e do not second-guess the . . . judge's credibility determinations because he or she has had the best opportunity to observe . . . the subject's . . . facial expressions, attitudes, tone of voice, eye contact, posture and body movements . . . ." Garcia, 66 F.3d at 856. A district court's credibility determination will not be disturbed unless it is completely without foundation. See United States v. Ferguson, 35 F.3d 327, 333 (7th Cir. 1994) (citation omitted). "[T]he trial judge's . . . choice of whom to believe is conclusive on the appellate court unless the judge credits exceedingly improbable testimony." United States v. Cardona-Rivera, 904 F.2d 1149, 1152 (7th Cir. 1990). In other words, "[w]e must accept the [testimony] unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact-finder could accept it." Yusuff, 96 F.3d at 986 (citing United States v. Saunders, 973 F.2d 1354, 1359 (7th Cir. 1992)). The court made the credibility determination as to whether or not to believe Kirk's testimony and the sentencing hearing transcript reveals that the judge carefully considered and fully explained her reasoning in her decision to enhance the sentence. The court noted that during the trial Kirk had inculpated himself in numerous criminal narcotics activities; that Kirk had no apparent motive to fabricate testimony about this issue because he and Mancillas were friends; that Kirk's story was corroborated by Marshall's testimony that Mancillas had asked Marshall to testify that he (Marshall) possessed the gun; and that Mancillas "had every reason in the world" to try and avoid the gun charges, because he understood the potential penalties he was facing for being a felon in possession of a firearm. We refuse to second guess the trial judge's credibility determination, particularly in light of such overwhelming corroborative evidence, and we are confident the court's credibility judgment was not clearly erroneous.

Mancillas, still not running out of challenges to the complete and well-reasoned trial record, next argues that the court engaged in impermissible "double counting" by adding the two-level increase to both Count One and Count Three for obstruction of justice. The trial court's finding on the issue of obstruction "is a factual one to be reviewed for clear error." United States v. Friend, 104 F.3d 127, 130 (7th Cir. 1997) (citing United States v. Hickok, 77 F.3d 992, 1007 (7th Cir. 1996)). Double counting

occurs when the court assesses more than one enhancement to the offense level for a single offense based on the same underlying conduct. See United States v. Haines, 32 F.3d 290, 293 (7th Cir. 1994) ("double counting occurs when identical conduct is described in two different ways so that two different adjustments apply"). However, we have expressly held that "there are cases where a defendant's obstructive conduct may be such that it obstructs or impedes two separate offenses." United States v. Perez, 50 F.3d 396, 399 (7th Cir. 1995) (citation omitted). Double counting refers to the impermissible practice of assessing more than one enhancement to the offense level for a single offense based on the same underlying conduct. See Haines, 32 F.3d at 293 (emphasis added). In the instant case, the court enhanced Mancillas' sentence on Count One (felon in possession of a firearm), and on Count Three (possession of marijuana with intent to distribute). Our decision in Haines makes clear that the trial court did not engage in "double counting" because Mancillas' obstructionist conduct was examined to enhance his sentence on two separate counts; his conduct was not cited as grounds for two separate enhancements on the same count. Thus, we hold that the sentencing court did not err.

  B. The Downward Adjustment for Acceptance of Responsibility.

  Finally, Mancillas contends that he was entitled to a two-level downward departure for acceptance of responsibility pursuant to USSG sec. 3E1.1 because he admitted, prior to trial, that the firearm and the marijuana belonged to him. Section 3E1.1 provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." In order to qualify for a downward adjustment for acceptance of responsibility, a defendant must: (1) demonstrate that he clearly recognizes and affirmatively accepts responsibility for his conduct; (2) timely notify authorities of his intentions to enter a plea of guilty; and (3) truthfully admit the conduct comprising the offense of conviction and admit, or not falsely deny or frivolously contest, the relevant conduct as it relates to the offense of conviction. USSG sec.3E1.1. If a defendant denies certain criminal conduct and the court determines it to have occurred as testified to, "the defendant cannot then claim that he has accepted responsibility for his actions." United States v. Akindele, 84 F.3d 948, 957 (7th Cir. 1996). We review the district court's factual findings regarding acceptance of responsibility under the clear error standard. See United States v. Wilson, 134

F.3d 855, 871 (7th Cir. 1998); United States v. Wettwattana, 94 F.3d 280, 285 (7th Cir. 1996). We give great deference to the sentencing judge's application of the Sentencing Guidelines. See USSG sec.3E1.1, cmt. n.5; United States v. Kirkland, 28 F.3d 49, 50 (7th Cir. 1994).

The district court found that Mancillas engaged in attempts to persuade two different people to claim ownership of the Taurus handgun found in his vehicle. Such conduct is patently inconsistent with the notion of full and clear acceptance of responsibility. The defendant contends that because he admitted prior to trial to Officer Cook that the Taurus handgun belonged to him, and that the 420 grams of marijuana found in the trunk was his, he was entitled to the reduction. The sentencing judge disagreed and denied Mancillas' request, initially finding that he admitted ownership of the marijuana in a proffer he made to the government under a letter of immunity, and because the admission was made in this protected setting, it did not reduce the government's obligation at trial to prove up each and every element of the case against Mancillas. Moreover, the court simply found that "these concessions . . . were not enough . . . to constitute an acceptance of responsibility." Mancillas put the government to the time and expense of a trial, requiring throughout that his guilt be proven beyond a reasonable doubt, and he attempted to impede the government's case all along the way. This case does not come close to the level of the "extraordinary" case which warrants the application of sec. 3E1.1. See United States v. Keeter, 130 F.3d 297, 299 (7th Cir. 1997) (adjustments under sec. 3E1.1 apply only in "extraordinary cases"), cert. denied, 118 S. Ct. 1331 (1998). We are convinced that the sentencing court correctly determined that a downward departure for acceptance of responsibility was not warranted.

The judgment and sentence of the district court are AFFIRMED.

FOOTNOTES

1  The facts described in this section of the opinion are extracted from the hearing transcript of Mancillas' motion to suppress unless otherwise noted.

2 At the time, Officer Cook was a nine-year veteran of the IPD who had been assigned to "street duty" for all but five months of his career, during which time he was assigned to "vice narcotics."

3  At trial, Cook testified that he drew his

weapon "because of the fact that there was a broadcast of him [the suspect, who later was proven to be Mancillas] having a gun . . . and the fact that they were all walking away in different directions, I did not want to get them separated, having me in some type of triangulation if they all did have weapons." In other words, Cook attested that he drew his weapon to protect his own safety.

4 The dispatcher actually assigned two officers other than Cook and Lopossa to respond to the call. However, both Cook and Lopossa were closer to the Club than the two assigned officers and thus volunteered to replace the officers in responding to the Club to investigate.

5 Cook explained that he had asked the question three times because "I wanted to know why somebody wanted to tell me they didn't have a gun in a vehicle when I'm looking directly at the handgun." Cook further testified that he found these circumstances "very suspicious."

6 Also at this time, other backup officers began arriving in the Club's parking lot.

7 Cook testified that during his nine years as an officer, and particularly his five months of service in the "vice narcotics" division of the IPD (which occurred in 1997), he learned to identify various drugs including marijuana and cocaine, and he also was taught to identify drug paraphernalia. Cook stated that officers on the force "come across several narcotic investigations where you have to make apprehension and confiscation of different types of controlled substances . . .", and that he himself has made "several" arrests involving the apprehension and confiscation of marijuana.

8 Indiana law provides that "a person shall not carry a handgun in any vehicle . . . without a license issued under this chapter being in his possession." Ind. Stat. Ann. sec.35-47-2-1.

9 The inventory search was performed pursuant to IPD regulations.
10 We do not discuss in detail any charges against Hardman or Marshall because their cases are not before us on appeal.

11 During the hearing, Mancillas also made an oral motion to suppress certain statements he made to Officer Cook; the oral motion is discussed later in this opinion.

12 The court did not specifically address the issue of whether the search of the automobile was justified in order to ensure the officers'

safety.

13 September 12, 1997, was a Friday; the Defendant's trial was scheduled to begin three days later, on Monday, September 15, 1997.

14 The record reveals that on May 29, 1997, the district court issued an order advising that all motions contemplated by the Federal Rules of Criminal Procedure (including motions to suppress evidence) were to be filed within fifteen days after the appearance of the Defendant's attorney. Mancillas' attorney appeared on June 4, 1997; thus Mancillas was required to file his motions to suppress by June 19, 1997. Because he failed to raise his Fifth Amendment Miranda arguments to suppress his statements until three days before trial, the court ruled that Mancillas failed to timely notify the government that he intended to challenge admission of his statements, and in fact did not challenge admission of his statements, until well after the court-mandated deadline and just days before trial.

15 The judge did not explicitly cite any particular rule or case authority in support of her decision that the Fifth Amendment argument was waived.

16 According to Marshall, Mancillas asked him to deliver five pounds of the marijuana to someone named "Jamie," and Mancillas also gave one pound to "Lefty" for his assistance in repackaging the marijuana.

17 It is quite obvious that Mancillas understood the consequences of the crime of being a felon in possession of a firearm as charged in Count One of the Indictment for he had asked Marshall to give false testimony regarding ownership of the gun.

18 The court and parties engaged in a brief discussion of this issue outside the presence of the jury wherein the AUSA explained the hypothetical she intended to propose. After hearing the entire hypothetical, the court found that it was permissible and overruled the Defendant's objection.

19 Agent Casey explained that in order to use one-half to three-quarters of a pound of marijuana before it loses its THC content and turns "stale," a person would have to smoke approximately thirty to thirty-five joints per day. Thus, he concluded that "anything . . . above a quarter pound personal stash . . . based on my experience . . . would be for distribution quantities." We note that the 420 gram package found in the Defendant's trunk equates to 14.7

ounces, or nearly one pound.

20  The citizen's report stated that the car was yellow while the officers described it as "greenish."

21  We recognize, as did the officer in DeBerry, that a gun in one's waistband can be pulled out and used in a matter of seconds.

22  We note our agreement with the trial court's conclusion, which Mancillas does not specifically challenge on appeal, that the search was justified because Mancillas did not resist turning his car keys over to Officer Cook when asked to do so, thereby allowing Cook to inspect the interior of the vehicle. At the suppression hearing, and again at trial, Officer Cook testified that he asked Mancillas for the keys to the locked Mercedes, and that Mancillas gave them to him. The trial court accepted Officer Cook's testimony as true, and the judge's credibility assessment is entitled to a great deal of deference. We do not second-guess the [trial] judge's credibility determinations because he or she has had the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record. United States v. Garcia, 66 F.3d 851, 856 (7th Cir. 1995) (citations and quotations omitted). As such, we accept the district court's reliance on Officer Cook's testimony and the court's subsequent determination that Mancillas relinquished his car keys so that Officer Cook could search the Mercedes for weapons and confiscate the handgun on the dashboard. "[T]he law is well established that if the officer asks rather than commands, the person accosted is not seized, and so the protections of the Fourth Amendment do not attach." DeBerry, 76 F.3d at 885. The record supports the district court's finding that Cook asked rather than commanded and that Mancillas turned over his keys and thus consented to the search of his vehicle. Mancillas presents "nothing to overcome the substantial deference we afford the district judge." United States v. Thompson, 106 F.3d 794, 798 (7th Cir. 1997) (quoting United States v. Lomeli, 76 F.3d 146, 149 (7th Cir. 1996)).

23  In Miranda, 384 U.S. at 444, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

defendant" unless the defendant is given warnings designed to safeguard his Fifth Amendment rights against self-incrimination.

24  As noted in the background section of this opinion, Cook testified at the suppression hearing that on the night of the arrest in the parking lot, Mancillas admitted actually owning the Taurus handgun. At trial, however, that testimony was not elicited from Cook and thus the statement was not admitted. Therefore, it is not challenged on appeal.

25  The trial court found that formal arrest had not yet occurred until the Defendant admitted he lacked a permit, and thus was in violation of Indiana law.

26  Similarly, in Mancillas' case, approximately five months after Mancillas was arrested the district judge issued an order advising the parties that "all MOTIONS contemplated by the Federal Rules of Criminal Procedure shall be filed within 15 days after [the] appearance by the attorney for the Defendant." The defense attorney initially appeared on June 5, 1997, thus motions were due June 20, 1997. As noted, Mancillas missed the deadline by failing to even imply that he desired to make Fifth Amendment objections at any time during pretrial proceedings and waited until September 12, 1997, literally the eve of trial, to make a motion to suppress his oral statements pursuant to Miranda.

27  At some point in his career, Special Agent Casey also taught a course on street identification drugs at the Indiana Law Enforcement Academy.