**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gregory V. BROWN, Defendant–Appellant.**

No. 96–4094.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1997.

Decided Jan. 12, 1998.

Christian R. Larsen (argued), Karine Moreno–Taxman, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Erich C. Straub (argued), Kachelski, Atta & Straub, Milwaukee, WI, for Defendant–Appellant.

Before RIPPLE, MANION and KANNE, Circuit Judges.

MANION, Circuit Judge.

Gregory Brown was convicted of three federal offenses relating to his illegal possession of firearms. He was sentenced to 240 months in prison on each count, to be served concurrently with one another. One of the convictions involved firearms recovered from a bag on the floor of Brown's automobile after Brown and a friend were stopped by police on suspicion of prowling. In *United States v. Brown*, 79 F.3d 1499 (7th Cir.1996) (*Brown I*), we affirmed Brown's convictions with one exception: we remanded and instructed the district court to determine whether the search of the bag was justified as a protective search under the Fourth

Amendment. On remand, the district court determined the search was constitutional, and Brown again appealed. But he filed his notice of appeal one day late, requiring him to ask the district court for a retroactive extension of time. The district court complied. We find that under the circumstances the district court did not abuse its discretion in granting the extension; we also affirm the court's decision on the merits.

## I.

Late one night in November 1993, a Milwaukee woman suspected prowlers in her neighborhood, prompting her to call the police. Milwaukee Police Officers Rebecca Pixley and Curtis Rueda responded to the call. The complainant described the prowlers as two black males (approximately 25 years old) dressed in dark clothing. Meanwhile, just down the street, Officers Joseph Erwin and Jesse Benitez were driving south on 48th Street when they noticed a black male in dark clothing sitting in the front passenger seat of a station wagon parked northbound at 3236 North 48th Street. A second black male in dark clothing (defendant Brown, it turns out) walked from the south side yard of that address, entered and started the station wagon, and drove away northbound.

Officers Erwin and Benitez then joined Officers Pixley and Rueda at the scene of the prowling, where they obtained a description of the alleged prowlers. Believing the profile matched the two men they had just observed driving away, Officers Erwin and Benitez caught up with and stopped Brown and his passenger about six blocks away. Officer Erwin yelled at Brown to shut off the car, step out, and come back to the squad car. Brown complied and Officer Erwin immediately handcuffed him, patted him down, and placed him in the squad car. While this was occurring, Officer Benitez instructed the passenger, Ronald Jones, to step out of the car for questioning. As a safety precaution, Officer Benitez then scanned the vehicle with his flashlight for additional occupants and for weapons. As he scanned the vehicle, he noticed a partially open black bag on the passenger side of the car. Protruding from the bag was a "shiny chrome object"; think-

ing it might be a weapon, Officer Benitez moved in closer and opened the bag. His hunch was correct: the shiny object was a .44 Magnum with a scope connected to its top. The bag also contained a second handgun, ammunition, handcuffs, a black knit mask, and a scanner. Officer Benitez then handcuffed Jones, placed him under arrest and put him in another squad car that had just pulled up to the scene.

In May 1994, Brown was indicted for three firearms-related crimes, one of which pertained to the November prowling incident. He was convicted on all counts and sentenced to 240 months in prison on each count, with the sentences to run concurrently. As we noted above, we affirmed those convictions with one exception: we determined that it was clear error for the district court (pursuant to a magistrate judge's recommendation) to admit the evidence seized from the black bag under the plain view doctrine. 79 F.3d at 1509. But we remanded so that the district court could determine whether the search of the bag was justified as a protective search under the Fourth Amendment. On remand, the district court examined the record and concluded that the search was a lawful protective search:

> [T]he officers had observed [Brown and Jones] lurking in front of a residence on the same block where a complainant had called in a prowler complaint involving two men.... The descriptions from the complainant matched the two men. Therefore, ... the officers, when pulling over Brown and his passenger, had reason to believe that the defendant was involved in criminal conduct. Also, the stop occurred at nighttime which elevated the safety issue. In addition, [Officer] Benitez saw a shiny, metallic, chrome object which he thought could be a weapon within a bag inside the car.... [And] the search occurred in a high crime area. These facts raise significant and very reasonable concerns regarding the dangerousness and threat of hidden weapons inherent in the situation which Officer Benitez faced in this case and created a reasonable need for protective measures that included the search of the bag inside the car.

Now Brown again has appealed; he challenges the district court's determination that Officer Benitez conducted a lawful, warrantless protective search. But under the rules he had only 10 days in which to file his appeal, Fed. R.App. P. 4(b), and it is undisputed that he filed the appeal one day late. Accordingly, before we can resolve the single substantive issue on appeal—whether Officer Benitez's search was lawful under the Fourth Amendment—we must determine whether we have jurisdiction over Brown's appeal in the first place. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982) (per curiam) (stating that a timely notice of appeal is "mandatory and jurisdictional"); *see also Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1561 (7th Cir.1990) (en banc; per curiam) ("This means what it says: if an appellant does not file his notice of appeal on time, we cannot hear his appeal.").

## II.

■ Filing his appeal one day late required Brown to return to the district court and ask for a retroactive extension of time. Upon a showing of "excusable neglect," Rule 4(b) allows the district court to extend the time for filing a notice of appeal up to 30 days. Fed. R.App. P. 4(b). In his affidavit supporting his motion for an extension, Brown's attorney (who was appointed appellate counsel by this court) explained that he had confused Wisconsin state rules with the Federal Rules. Specifically, he believed that weekends and holidays tolled the 10–day period, which they do in Wisconsin (and would do under Fed.R.Civ.P. 6(a)) because the prescribed filing period is less than 11 days. But under the Federal Rules of Appellate Procedure, Saturdays and Sundays are excluded only if the prescribed period is less than *seven* days. Fed. R.App. P. 26(a). So a criminal defendant such as Brown has 10 days (counting weekends) to file his notice of appeal, unless he persuades the district court that a later filing resulted from "excusable neglect."

The Federal Rules do not define "excusable neglect," but Brown's lawyer believes the term at least should cover the reason given for his mistake: "[Brown] is my only client in the Federal Court system, and the rest of my practice is in the State of Wisconsin court system." The district court found that reason to be persuasive, and even added a few considerations, namely, that the notice of appeal was untimely by only one day and prejudiced no one, and that the court's judgment became final over a holiday period (Thanksgiving), which could have caused some confusion.

■ "The real question here is not whether we would have found ... excusable neglect but rather whether we should second-guess the trial judge's decision that it was." *Varhol*, 909 F.2d at 1564. We can disagree with the district court's decision, but we can reverse only if we find that granting the extension was an abuse of his discretion. *Id.* It is difficult to draw bright lines in this inquiry. The test as to what constitutes excusable neglect is an "equitable one," taking account of "all relevant circumstances surrounding the party's omission." *Pioneer Investment Services Co. v. Brunswick Associates*, 507 U.S. 380, 395, 113 S.Ct. 1489, 1498, 123 L.Ed.2d 74 (1993).[1] These circumstances include "the danger of prejudice [to the non-moving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* Two of these factors receive special consideration: "the lack of prejudice to the [nonmovant] or to the interests of efficient judicial administration, combined with the good faith of [the defendant and his counsel], weigh strongly in favor of permitting the tardy claim." *Id.* at 398, 113 S.Ct. at 1499.

■ The government claims no prejudice caused by the one-day delay. Indeed, it recommends that we allow the late filing, while at the same time it curiously contends that the attorney's reasons fall far short of

1. The Court was not talking about Rule 4(b), "but the tenor of its opinion is that the term bears the same or similar meaning throughout the federal procedural domain." *Prizevoits v. Indiana Bell Telephone Co.*, 76 F.3d 132, 134 (7th Cir.1996).

constituting excusable neglect "even applying an abuse of discretion standard of review." If the reason for the delay were the only factor to consider, or even the most important one, we might agree that the neglect in this case could not be excused. *See Varhol,* 909 F.2d at 1563 ("unfamiliarity with or misunderstanding of the federal rules, except in rare instances, is generally not excusable neglect"). But *Pioneer* makes clear that the standard is a balancing test, meaning that a delay might be excused even where the reasons for the delay are not particularly compelling. We cannot say that the one-day delay has prejudiced this court (though the discussion here demonstrates that it has required the court and the parties to devote resources to the issue in general), and while Brown's attorney in this case may have fallen a bit short of good lawyering, no one has suggested that he lacked good faith.

In addition to the factors noted by the Supreme Court in *Pioneer*, we consider the relative inexperience of Brown's attorney. "The federal rules are complex—a minefield for lawyers not experienced in federal practice." *Prizevoits,* 76 F.3d at 133. In *Prizevoits,* experience within the federal courts worked against the attorney claiming excusable neglect. *Id.* ("Prizevoit's principal lawyer is a highly experienced federal litigator. He must know about [the rule].") Here, because of his inexperience Brown's attorney admits he did not know the rule. He had only one client in the federal courts—Brown himself. To his credit, the attorney is not pointing a finger at others for his failing—he blames his own misunderstanding of the rules.

We also consider that dismissing Brown's appeal would be a harsh sanction for a relatively minor legal mistake. Proportionality has its appeal. *See Lorenzen v. Employees Retirement Plan of the Sperry & Hutchinson Co.,* 896 F.2d 228, 232–33 (7th Cir.1990) ("If the mistake is slight, nonprejudicial, easily understandable, could happen to the best of us, etc., then dismissal of the appeal, with prejudice, may be an excessive sanction."). And in this case the result of a dismissal would be an untidy one. Brown would file a motion under 28 U.S.C. § 2255 to vacate his conviction "on the ground that by failing to perfect the appeal [his] counsel caused [him] to lose the right to effective counsel that the Sixth Amendment confers on him." *United States v. Marbley,* 81 F.3d 51, 52 (7th Cir. 1996). If the motion was granted, "as it would have to be since there is no suggestion that the defendant bore any responsibility for his lawyer's failure to file a timely appeal, the appeal would again be reinstated." *Id.* (internal citations omitted). Of course here the lawyer has admitted full responsibility for the mistake.

At bottom, we affirm the district court's decision allowing the untimely appeal because there is nothing in the record suggesting that it abused its discretion in reaching this result. The court considered the attorney's inexperience, good faith, and the lack of prejudice occasioned by his mistake. These are reasonable factors to consider, and ones invited by the Supreme Court in *Pioneer* and this court in *Prizevoits*. Balancing tests naturally produce indeterminacy; focusing on one factor may change the balance, and, in turn, the result. But there are two reasons why it would be a mistake for attorneys to rely on such slipperiness. First, the reasons behind some delays will be unexcused no matter what the countervailing factors. *See Prizevoits,* 76 F.3d at 133 (labeling as "transparently inadequate" attorney's reasons for filing untimely appeal). Second, attorneys who file untimely appeals must "throw [themselves] on the mercy of the district judge," who must decide "as a matter of discretion whether to forgive the appellant's neglect." *Lorenzen,* 896 F.2d at 233. In a close case like this one, we might affirm a district court that refused to exercise lenity. "The risk of such an outcome is punishment enough for an error at once understandable and harmless, yet very costly to the appellant." *Id.* A district court best knows the impact the error has on the court's operation and calendar. It knows the attorney and his motives, the circumstances of the case and the judicial economy of excusing the neglect. Under the facts of this case we conclude the court did not abuse its discretion in granting the extension under Rule 4(b).

### III.

We turn to the merits and the only substantive issue on appeal—whether the district court erred in denying Brown's motion to suppress the evidence uncovered by Officer Benitez's search of the car. When reviewing a district court's denial of a motion to suppress, we review the court's legal determinations de novo, and its findings of historical fact for clear error. *Ornelas v. United States,* 517 U.S. 690, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *United States v. Stribling,* 94 F.3d 321, 323 (7th Cir.1996). In remanding the case on the protective search issue, we instructed the district court that it make its determination "based on the existing record and confined to the testimony and other evidence previously presented." *Brown I,* 79 F.3d at 1510.

The district court correctly noted that the standard for lawful, warrantless protective searches is well-established. In *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983), the Supreme Court held that under certain conditions a warrantless search of an automobile (limited to the areas in which a weapon may be placed or hidden) is permissible. The police officer must possess "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and . . . may gain immediate control of weapons." 463 U.S. at 1049–50, 103 S.Ct. at 3480–81 (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). The test is reasonableness: would a "reasonably prudent man in the circumstances be warranted in the belief that his safety or that of others was in danger?" *Id.* at 1050, 103 S.Ct. at 3481.

Several factors convince us that Officer Benitez conducted a lawful search of Brown's automobile. As the district court noted, there is no dispute that Brown and Jones (his passenger) matched the description of the prowlers in the area. When they were stopped, they were only blocks away from the complainant who called the police, and the police first spotted them in the immediate vicinity of the complaint. Therefore, at the time of the stop, Officers Benitez and Erwin already suspected that Brown and Jones were law-breakers. It is no wonder that Officer Erwin did not want to approach the car and instead yelled to Brown to shut off (and step out of) his car. They were suspected prowlers, stopped by the police late at night in the middle of what Brown himself concedes was a high-crime neighborhood. *See United States v. Evans,* 994 F.2d 317, 321 (7th Cir.1993) ("The neighborhood . . . surely increased the risk that the defendant was armed and affected the officers' judgment as to the danger present.").

Brown and Jones did not get out of the car at the same time. First, Brown got out. Officer Erwin handcuffed him and placed him in the squad car. Officer Benitez then asked Jones to exit the car, and while Jones stood by the car, Benitez scanned the vehicle with his flashlight, looking for additional occupants or weapons. At the suppression hearing, he explained why police "light up the car" with takedown lights and scan the interior with a flashlight: "for our safety." That's reasonable. Jones was not so far from the car that he could not lunge for a gun inside it, or, in the words of the Supreme Court in *Michigan v. Long,* not so far that he could not have gained "immediate control of weapons." 463 U.S. at 1049, 103 S.Ct. at 3480.

But perhaps most important, Officer Benitez had a choice: arrest Jones or allow him to re-enter his car without first searching it for weapons. At that point, there were no grounds for an arrest (only a suspicion of prowling), and letting Jones (or, for that matter, Brown) re-enter the car without first searching it might well have been dangerous. *Id.* at 1051–52, 103 S.Ct. at 3481–82 (rejecting argument that suspect under control of officer could not pose a threat to officer's safety because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside."). The fear generated from the "risk of re-entry" is a reasonable one; we have held that it exists even when weapons are locked in the vehicle's glove compartment. *See United States v. Holifield,* 956 F.2d 665, 668–69 (7th Cir.1992)

(once inside the car, "it would have taken only a few seconds for [the suspects] to remove the keys from the ignition and unlock the compartment"). In this case, the risk was especially heightened because the black bag was so accessible; it sat on the floor of the car on the passenger's side, and it was partially open. Moreover, Officer Benitez noticed a shiny chrome object which he thought could be a weapon. While what appeared to be a weapon may not have been in plain view, the "shiny chrome object" was protruding somewhat from the bag. At that point, the danger posed by the encounter multiplied exponentially; Officer Benitez had no reasonable choice other than to open the bag. That search exposed a .44 Magnum handgun with a scope connected to the top.

In short, the question is why Officer Benitez searched the bag on the floor of the car. According to his testimony, and the district court's findings of fact supported by the record, he did so because he suspected a gun, because he and his partner were in a high-crime neighborhood looking for prowlers that resembled Brown and Jones, and because, in his words, he feared "for [their] safety." That makes his search of the bag reasonable, and lawful, too.

For all of these reasons, Brown's conviction is AFFIRMED.