In the

# United States Court of Appeals
### For the Seventh Circuit

No. 10-2926

ELTAYEB ABUELYAMAN,

*Plaintiff-Appellant*,

*v.*

ILLINOIS STATE UNIVERSITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07-CV-01151—**Michael M. Mihm**, *Judge.*

ARGUED SEPTEMBER 29, 2011—DECIDED DECEMBER 13, 2011

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Eltayeb Abuelyaman, an Arab Muslim, served as an associate professor at Illinois State University's School of Information Technology from 2001 to 2006. Abuelyaman's performance record was consistently sub-par, and he frequently sparred with policy decisions made by his supervisor. In March 2006, Abuelyaman was informed that his contract would not be renewed for the 2007-2008 school year. Abuelyaman filed suit, alleging that Illinois

State refused to renew his contract based on his race, national origin, and religion, and in retaliation for several claimed instances of complaining about discrimination, all in violation of Title VII. The district court granted Illinois State summary judgment on Abuelyaman's discrimination claim and one of his retaliation theories, and then during trial granted Illinois State judgment as a matter of law on another one of his retaliation theories. After a jury found for Illinois State on Abuelyaman's one remaining retaliation theory, he appealed. Because we agree with the district court at every turn, we affirm.

## I. Background

We begin in the murky world of academic ranking and tenure systems. Illinois State has a three-tiered professor ranking system which, listed from the lowest rank to highest, is composed of assistant professors, associate professors, and full professors. Not surprisingly, Illinois State imposes increased performance standards as a professor ascends in rank. For example, an assistant professor, who is typically new to the academic arena, is not expected to have achieved the "regionally and nationally recognized accomplishments" (such as grant awards and published works) of a more experienced associate professor. Assistant professors are usually promoted to associate professors only after their fourth year of service, and even then such a promotion is ordinarily contingent on a recommendation for tenure.

In addition to its ranking system, Illinois State faculty members are classified as tenured, probationary tenure-

track, or nontenure-track. A tenure-track professor must serve a six-year probationary period during which the professor is granted a series of one-year contracts. Employment beyond one year is not guaranteed; a professor's contract renewal is contingent on a recommendation from the school in which the professor teaches. Eventually, a professor's school must decide whether to grant a professor tenure; this decision must be made at least one year before that professor's probationary period expires. To be considered for tenure, a faculty member must hold the rank of either associate professor or full professor. Moreover, tenure is "not automatic"; the professor must maintain a level of "high quality professional performance" and demonstrate a compatibility with Illinois State's long-term goals.

Such competitive standards for both ranking and tenure call for a rigorous evaluation process. Accordingly, Illinois State maintains a comprehensive policy that requires individual schools and departments to evaluate professors in the three categories of teaching, scholarly productivity, and service. Individual schools and departments are given wide latitude, however, to adapt Illinois State's policy "to their own unique situations." Schools set up committees to complete periodic faculty evaluations as well as to make recommendations on merit-based raises, tenure, promotion, and reappointment.

During Abuelyaman's employment with the Illinois State School of Information Technology ("IT School"), the IT School's Faculty Status Committee ("Status Committee") conducted an annual review of each of the IT School's professors and distributed evaluations every January. The

Status Committee was composed of the IT School director and three peer-elected professors who were elected to two-year terms. The Status Committee scored professors in the three categories mentioned above according to the following weighted formula: teaching comprised 50% of a professor's overall performance score; scholarly productivity comprised 40%; and service comprised the remaining 10%. Although this scoring system was the same for every professor regardless of rank or tenure status, the Status Committee took into account the different performance standards associated with a professor's rank when assigning that professor a score.

Abuelyaman, a Muslim of Sudanese, Yemeni, and Saudi Arabian descent, was hired by the IT School in Fall 2001 as a probationary, tenure-track associate professor. He was the only nontenured associate professor in the IT School. Abuelyaman received consistently low marks on his annual performance reviews. His first evaluation in January 2002 noted that, out of all his colleagues, he received the worst mark in service, tied for worst in teaching, and was ranked 11th of 15 in scholarly productivity. In November 2002 Abuelyaman's department chair expressed concern in a letter over "the quality and thoroughness of some of [Abuelyaman's] work." Despite this warning, Abuelyaman's next three evaluations were similarly poor. The Status Committee's January 2005 evaluation noted that Abuelyaman's student evaluations were "weak," his publication record left the Status Committee with "unanswered questions," and he needed to become more involved in service. Though his performance was "satisfactory" overall, the Status Committee told him

that it was not enough to ensure tenure or promotion. Abuelyaman improved slightly in the next year; his January 2006 evaluation ranked him as "Meritorious" in the areas of both teaching and scholarly productivity and "Effective" in service.[1] Again, however, the Status Committee was left unimpressed by Abuelyaman's overall performance. It characterized Abuelyaman's scholarly productivity as "below the average for [IT School] faculty." And although his teaching was "slightly above average," Abuelyaman was nevertheless admonished to "work on improving [his] teaching activities still further, . . . including the currency of [his] materials." Finally, the Status Committee characterized his service as "low compared to other [IT School] faculty," and encouraged him "as [it] did last year, . . . to get more actively involved in this area."

Despite receiving these consistently low evaluations, Abuelyaman argues that he, along with others, was the victim of discrimination within the IT School. The relevant instances of alleged discriminatory conduct involve IT School director Dr. Terry Dennis, who was appointed to that position in Fall 2004. At the time Dr.

---

[1] Despite these misleading labels, Abuelyaman's January 2006 evaluation was still sub-par. Indeed, the ranking classifications from which the Status Committee had to choose in assessing a professor's teaching, scholarly productivity, and service were, in ascending order, "Acceptable," "Effective," "Meritorious," "Excellent," or "Outstanding." Thus, Abuelyaman's marks were the functional equivalent of two average scores and one below-average score.

Dennis was appointed, the IT School had the worst teaching evaluations in the entire College of Applied Science and Technology. To remedy this shortcoming, soon after he was appointed IT School director Dr. Dennis changed the faculty evaluation process by instructing the Status Committee to accord greater weight to student evaluations. When Dr. Dennis announced this change in a faculty meeting, Abuelyaman immediately complained that foreign-born professors would be greatly disadvantaged because students were biased against them. Several other professors, including Drs. Eta, Zeta, and Delta,[2] voiced their agreement with Abuelyaman. Abuelyaman complained to Dr. Dennis at least two more times, once in a Spring 2005 faculty meeting and once in a private conversation. Ultimately, these complaints fell on deaf ears and student evaluations were accorded more weight by the Status Committee when it conducted annual evaluations.

Additionally, Abuelyaman participated in the investigation of two complaints filed with the Diversity Office. One complaint was filed by Dr. Zeta on January 17, 2006, after Dr. Dennis had informed Dr. Zeta approximately two months earlier that the Status Committee had voted not to reappoint him for the next school year. In his complaint, Dr. Zeta alleged that the Status Committee had discriminated against him in part because he twice supported

---

[2] In an unopposed motion dated September 26, 2011, Illinois State requested that all documents that had been placed under seal by the district court remain under seal on appeal. We granted that motion. The parties subsequently redacted their briefs, using pseudonyms for certain faculty members.

Abuelyaman's complaints during faculty meetings that foreign-born professors were not fairly evaluated by students. Abuelyaman backed Dr. Zeta, and even voiced his concerns to Illinois State president Dr. Bowman that Dr. Zeta was the victim of discrimination.[3] Abuelyaman also participated in an interview on February 21, 2006, as part of the Diversity Office's investigation into Dr. Zeta's complaint. During that interview, Abuelyaman confirmed Dr. Zeta's support for Abuelyaman's complaints about student evaluations, elaborated on why he believed those evaluations were unfair to foreign-born professors, and described an overarching "culture of unfairness" that plagued the IT School. The Diversity Office also interviewed Dr. Dennis (who, as IT School director, was a member of the Status Committee that had voted not to reappoint Dr. Zeta) and two other IT School professors. Ultimately, the Diversity Office found that Dr. Zeta was terminated based on a failure to improve his teaching performance and not because of his race or national origin.

---

[3] Abuelyaman initially contended that he complained to two individuals about his belief that Dr. Zeta was discriminated against: Dr. Bowman and Dean Lamberson. But Abuelyaman was apparently fuzzy on certain details, including the precise name of the dean to whom he complained. As the district court observed, there was no "Dean Lamberson" at Illinois State, and even two weeks before trial Abuelyaman could not name the dean to whom he had allegedly complained. As a result, Abuelyaman omits any mention of Dean Lamberson from his brief; thus, we will disregard him in this opinion.

The other complaint was filed by Dr. Delta in Fall 2005 and cited undue influence by Dr. Dennis in an IT School search committee's ("Search Committee") efforts to locate a new telecommunications professor for the IT School. Dr. Delta complained that after the Search Committee had chosen a professor to recommend for appointment, Dr. Dennis asserted his authority as director of the IT School and pushed Search Committee members to recommend a different candidate. Abuelyaman, who was a member of the Search Committee, not only participated in the Diversity Office's subsequent investigation, but also complained to Dr. Dennis in person about the latter's improper influence over relatively junior Search Committee members.

Things came to a head on March 20, 2006. That day, Abuelyaman told Dr. Dennis that he had participated in the Diversity Office's investigation of Dr. Delta's complaint concerning Dr. Dennis's involvement with the Search Committee.[4] Although Abuelyaman emphasized that he had not been the one to file the complaint itself, Dr. Dennis apparently became visibly angry. Within ten minutes of this conversation, Dr. Dennis informed Abuelyaman that the Status Committee had voted not to reappoint him to his position as an associate professor past May 2007. Abuelyaman also received a letter dated March

---

[4] In his brief, Dr. Dennis admits that "[s]omeone from the [Diversity] Office talked to [him] about a complaint concerning his participation in the Search Committee, 'likely' before March 16"; however, he did not know who had filed the complaint or who had participated in the subsequent investigation.

16, 2006, that memorialized his non-reappointment. Abuelyaman finished the 2006 school year and even returned the following fall, but he quit after two weeks and accepted a position at Prince Sultan University in Saudi Arabia.

In September 2006, Abuelyaman filed a complaint with the Equal Employment Opportunity Commission, alleging that he had not been reappointed because Illinois State had discriminated against him on the basis of his race, religion, and national origin. After receiving a right-to-sue letter, Abuelyaman filed suit in the U.S. District Court for the Central District of Illinois. Abuelyaman alleged that Illinois State had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, by discriminating against him and by retaliating against him because: (1) he had complained that using student evaluations to assess professors was unfair to foreign-born faculty members; (2) he had complained to Dr. Bowman that Dr. Zeta was the victim of discrimination; and (3) he had participated in Dr. Delta's complaint investigation. Illinois State filed a motion for summary judgment, and the district court granted that motion on Abuelyaman's discrimination claim and one of his retaliation theories, namely, his complaint to Dr. Bowman that Dr. Zeta was the victim of discrimination. In opposing summary judgment, Abuelyaman also attempted to present a fourth scenario to support his retaliation claim; specifically, he argued that the Status Committee did not renew his contract because he had participated in the Diversity Office's investigation of Dr. Zeta's complaint against the Status Committee. The district court summarily rejected this new retaliation theory

because Abuelyaman did not disclose this theory during discovery and because there was no evidence that the Status Committee in fact knew that Abuelyaman had participated in that investigation.

As the case proceeded to trial, Illinois State filed two motions in limine seeking to preclude Abuelyaman from introducing certain pieces of evidence at trial. The court granted the motions in part, barring, among other things, several IT School professors' salary and performance data, the Diversity Office's investigation report on Dr. Zeta's discrimination complaint, and several documents relating to Dr. Delta's complaint about Dr. Dennis's involvement with the Search Committee. The court noted, however, that Abuelyaman would be allowed to question Dr. Dennis and Status Committee members about whether they knew of his participation in the Diversity Office's investigation into Dr. Delta's complaint at the time they made their decision not to reappoint Abuelyaman. Finally, two weeks before trial the court held a telephone conference to assess again whether Abuelyaman had any evidence that the Status Committee knew of Abuelyaman's complaint to Dr. Bowman concerning alleged discrimination against Dr. Zeta. Finding that Abuelyaman did not have any such evidence, the district court precluded any evidence concerning Dr. Zeta's discrimination claim or Abuelyaman's participation in the resulting Diversity Office investigation.

At this point, the case was ready for trial on the two surviving retaliation theories: (1) Abuelyaman's argument that Illinois State had retaliated against him for his partici-

pation in Dr. Delta's complaint investigation; and (2) Abuelyaman's argument that Illinois State had retaliated against him for complaining that giving student evaluations greater weight prejudiced foreign-born faculty members. After Abuelyaman had presented all of his evidence at trial, Illinois State moved for a judgment as a matter of law on both theories. The district court granted the motion on Abuelyaman's theory that he was retaliated against because he had participated in Dr. Delta's complaint investigation because Abuelyaman had failed to establish that he had engaged in a statutorily protected activity. But the court denied the motion on Abuelyaman's student-evaluation theory, which was then considered by the jury. The jury returned a verdict in favor of Illinois State. Abuelyaman appeals.

## II.  Notice of Appeal

We briefly discuss Illinois State's significant contention that the district court erred in granting Abuelyaman an extension of time to file a notice of appeal. On the eve of oral argument, Illinois State filed supplemental briefing in which it insisted that the district court erred in granting Abuelyaman's motion to extend the time to file a notice of appeal. Specifically, Illinois State argued that Abuelyaman's explanation for his late filing did not satisfy Federal Rule of Appellate Procedure 4(a)(5)(A)'s "excusable neglect" standard as construed by this court in *Prizevoits v. Indiana Bell Telephone Co.*, 76 F.3d 132, 133-34 (7th Cir. 1996). We review a district court's decision to grant a motion to extend time to file a notice of appeal for

abuse of discretion. *United States v. Brown*, 133 F.3d 993, 996 (7th Cir. 1998).

Federal Rule of Appellate Procedure 4(a) requires a party to file a notice of appeal "within 30 days after the judgment or order appealed from is entered." Fed. R. App. P. 4(a)(1)(A). A party may move for an extension of time to file a notice of appeal provided (1) such a motion is made within 30 days after the original deadline has passed, and (2) if filed within 30 days after the prescribed time the moving party demonstrates "excusable neglect or good cause" for failing to file the notice on time. Fed. R. App. P. 4(a)(5). We are concerned here only with the district court's holding that Abuelyaman's attorney demonstrated the requisite excusable neglect to allow for an extension of time.

Illinois State is correct to point out that "excusable neglect" is far from a toothless standard. Indeed, "[a]n unaccountable lapse is not excusable neglect. . . . The term 'excusable neglect' . . . refers to the missing of a deadline as a result of such things as misrepresentations by judicial officers, lost mail, and plausible misinterpretations of ambiguous rules." *Prizevoits*, 76 F.3d at 133-34 (citing *Lorenzen v. Employees Retirement Plan*, 896 F.2d 228, 232-34 (7th Cir. 1990); *Redfield v. Cont'l Cas. Corp.*, 818 F.2d 596, 602 (7th Cir. 1987)). But the "excusable neglect" standard is not a merciless one, either. At bottom, "[t]he test as to what constitutes excusable neglect is an 'equitable one, taking account of all relevant circumstances surrounding the party's omission.' " *Brown*, 133 F.3d at 996 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs., Inc.*, 507 U.S. 380,

395 (1993)). Thus, "the standard is a balancing test, meaning that a delay might be excused even where the reasons for the delay are not particularly compelling." *Id.* at 997. Analysis of the circumstances surrounding a motion for an extension of time to file an appeal involves the consideration of several factors, the most important of which are the degree to which the appellee is prejudiced and the good faith of the appellant. *Id.* at 996 (citing *Pioneer*, 507 U.S. at 398).

In this case, Abuelyaman's attorney purported to file and serve the notice of appeal electronically one day before the filing deadline. Unfortunately, something went awry and none of the documents was properly filed. Counsel averred that not only had she attempted to file and serve the notice electronically, but also that she had provided the clerk's office with her credit card information to process the filing fee payment and that she mailed a copy of the notice of appeal to her co-counsel. Six days after the filing deadline, counsel realized that the documents had not been filed and promptly filed a motion to extend the time for filing the notice of appeal. Given these facts, the district court did not abuse its discretion in finding that counsel acted in good faith when she attempted to file the notice of appeal. True, counsel's suspicions should have been aroused when she failed to receive a standard electronic confirmation; however, it seems quite clear that counsel believed that she had fully complied with the filing requirements, especially when she concomitantly attempted to pay the filing fee. Moreover, Illinois State can hardly claim prejudice when the motion to extend time was filed only six days after the deadline and when it did

not even bother to respond to that motion. Under these circumstances, there was no abuse of discretion and this case is properly before us.

### III.  Title VII Claims

We turn then to the substance of Abuelyaman's appeal. On appeal, Abuelyaman argues that the district court erred in granting Illinois State summary judgment on his discrimination claim and one of his theories of retaliation. He also challenges the court's grant of judgment as a matter of law on his second retaliation theory.

We review the district court's granting of summary judgment de novo. *Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011). In considering the district court's granting of summary judgment, we construe all facts and draw all inferences in favor of the nonmoving party, *id.*, and will affirm if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Likewise, we review de novo the district court's granting of Illinois State's Rule 50 motion for judgment as a matter of law at trial on Abuelyaman's theory that he was retaliated against because he had participated in Dr. Delta's complaint investigation. *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009) (citation omitted). "We will uphold a trial court's grant of judgment as a matter of law only if, after viewing all the evidence, no reasonable jury could have found for [Abuelyaman] on each essential element of [his] claim." *Harper v. Albert*, 400 F.3d 1052, 1061 (7th Cir. 2005) (citation omitted).

Title VII prohibits discrimination in employment on the basis of race, national origin, and religion, among other categories. *See* 42 U.S.C. § 2000e-2(a); *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 303 (7th Cir. 2000). It also prohibits retaliation against those who oppose discriminatory conduct. 42 U.S.C. § 2000e-3(a); *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751 (7th Cir. 2002). Both discrimination and retaliation claims may be established using either the "direct" or "indirect" methods of proof. *See Atanus v. Perry*, 520 F.3d 662, 671, 677 (7th Cir. 2008). Here, the parties proceed under the direct method, and we will limit our analysis to that method.

The direct method, as we have noted before, is misleading because it "tends to imply that an employee only may proceed . . . with 'direct evidence.'" *Id.* at 671 (citing *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006)). The standard is broader than that. Although the direct method of proof may certainly include direct evidence that comes in the form of "near-admissions by the employer that its decisions were based on a proscribed criterion," such proof "also includes circumstantial evidence [that] suggests discrimination albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006) (citations omitted). Thus, "[t]he focus of the direct method is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for an employer's action." *Atanus*, 520 F.3d at 671 (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n.3 (7th Cir. 2006)).

### A. Discrimination Claim

We first address Abuelyaman's contention that the district court erred in granting summary judgment on his discrimination claim. Lacking direct evidence, Abuelyaman attempted to prove his discrimination claim by weaving together a "convincing mosaic" of circumstantial evidence that would allow a reasonable fact finder to infer that his contract was not renewed because of his race, national origin, or religion. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). We have described three categories of circumstantial evidence that may be used to prove intentional discrimination: (1) "suspicious timing" of the adverse action against the plaintiff, "ambiguous statements" made by the employer, an employer's conduct toward other employees in the same protected group as the plaintiff, and "other bits and pieces" of evidence "from which an inference of discriminatory intent might be drawn"; (2) evidence that employees who are outside the plaintiff's protected group but who are otherwise "similarly situated" to the plaintiff "received systematically better treatment"; and (3) evidence that a qualified plaintiff was replaced by or was passed over for a position in favor of an individual who was not in the plaintiff's protected group and that the employer's stated reason for not choosing the plaintiff was merely pretextual. *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720-21 (7th Cir. 2005) (citation omitted).

Abuelyaman's claim on appeal that he presented sufficient direct evidence of discrimination focuses on the first two categories listed above. Specifically, he argues that the

district court erred in discounting at summary judgment, and refusing to admit at trial, comparative evidence of other IT School professors' performance records and salary data, witness accounts alleging discriminatory treatment of other professors, and other evidence that could lead a rational fact finder to conclude that a discriminatory atmosphere existed in the IT School.[5]

### 1. Similarly Situated

In an attempt to create a convincing mosaic of circumstantial evidence to support his discrimination claim, Abuelyaman first contends that similarly situated profes-

---

[5] Abuelyaman also argues in a conclusory fashion that the comparative evidence rejected by the district court was relevant not only to his discrimination claim (which was rejected at summary judgment), but also to the causal connection element of his retaliation claim at trial. This is incorrect on its face. As outlined below, a retaliation claim requires (1) that the plaintiff engage in a protected activity, (2) that the plaintiff incur some adverse employment action, and (3) a causal connection between the two. *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) (citation omitted). None of the evidence recounted in this section involves a protected activity, which requires lodging some form of complaint alleging discriminatory conduct on the part of the employer, *see Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009), and thus the district court did not abuse its discretion by excluding such evidence from trial. Because we need say nothing further about this evidence as it applies to Abuelyaman's retaliation claims, we limit our discussion to his discrimination claim only.

sors outside his protected group were treated better than he was, and thus that the district court should have considered evidence of those professors' performance records. At the outset, we acknowledge that our similarly situated analysis "should not be applied mechanically or inflexibly." *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006). Yet Abuelyaman still must demonstrate that his purported comparators are "directly comparable to [him] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted). Although the specific factors we consider in determining the comparability of employees will vary on a case-by-case basis, factors that we have found especially helpful include whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) (citing *Patterson*, 281 F.3d at 680).

Abuelyaman argues that, in performing the similarly situated analysis, we should disregard the titular differences between assistant, associate, and full professors, as well as the differences between tenured and non-tenured professors. Indeed, Abuelyaman contends that because Illinois State uses the same criteria for evaluating all professors, and a single supervisory entity—the Status Committee—performs evaluations for every professor, the foregoing distinctions do not matter. But that argument is meritless. The Illinois State employ-

ment policy handbook recognizes that higher-ranking professors (e.g., associate professors versus assistant professors) should perform at higher levels than lower-ranking professors. The Status Committee apparently took these common-sense distinctions into account when evaluating professors of different ranks, which was a discretionary function that it was accorded by Illinois State's decentralized evaluation process. Thus, despite the use of uniform evaluation criteria, distinctions between ranking levels matter significantly because those distinctions show that professors of different ranks are not evaluated under the same standards, and that such professors most likely do not have comparable experience, education, and other qualifications. Moreover, tenured faculty enjoy significantly greater "[f]reedom and economic security" than their nontenured counterparts. Thus, as we have stated before, tenured professors are simply not subject to the same stringent standards as nontenured professors and therefore cannot serve as comparators. *See Keri v. Bd. of Trustees*, 458 F.3d 620, 644-45 (7th Cir. 2006).

With these crucial distinctions in mind, we reiterate that Abuelyaman was the only nontenured associate professor in the IT School during his six-year period of employment. We believe that the district court could have disposed of the similarly situated issue based on this fact alone. Indeed, as the court aptly stated, "[i]f it were as Abuelyaman suggests, it would be pointless to have differing ranks and tenure."

But the district court went further, comparing Illinois State's treatment of nontenured professors of different

ranks who, like Abuelyaman, received poor performance evaluations. The court found that Abuelyaman could not demonstrate that he was treated differently than such professors. We agree with this conclusion. It is undisputed that Abuelyaman consistently received below-average to average marks on his evaluations. Yet three nontenured assistant professors—Drs. Xi, Zeta, and Iota—who were given similarly poor performance evaluations during the same time period as Abuelyaman were likewise not reappointed. Another assistant professor, Dr. Theta, received a poor performance evaluation in January 2005. Dr. Theta's evaluation was poor enough to warrant an explicit warning from Dr. Dennis that if he did not improve his teaching skills, he would not be reappointed the following year. Dr. Theta's teaching apparently did improve—dramatically—by 2006 as evidenced by his creation of a new series of courses and his securing a grant for Illinois State. Abuelyaman showed no such improvement, and (perhaps predictably) was not reappointed. Abuelyaman thus failed to demonstrate that he was treated differently from those professors outside his protected class who were similarly situated to him with respect to performance. Accordingly, there is no direct evidence that Abuelyaman was treated differently than similarly situated individuals outside his protected class.

## 2. Other Circumstantial Evidence

Abuelyaman next contends that there are "ambiguous statements" attributable to Illinois State and other "bits and pieces" of circumstantial evidence "from which an

inference of discriminatory intent might be drawn." *Rudin*, 420 F.3d at 720-21. Specifically, Abuelyaman argues that the following is sufficient circumstantial evidence to preclude summary judgment: Dr. Nu's affidavit in which he stated that members of the IT School—specifically Dr. Beta, a member of the 2006 Status Committee—were biased against Middle Eastern males; Dr. Beta's alleged discriminatory evaluation of a Middle Eastern applicant; Dr. Gamma's expression of frustration with a Middle Eastern professor's (not Abuelyaman) inability to attend meetings on Muslim days of worship; the alleged discriminatory manner in which the IT School evaluated Abuelyaman's teaching skills; and the non-renewal of Abuelyaman's contract despite an improved performance evaluation.

We first address Dr. Nu's affidavit. This piece of evidence is largely bereft of specific allegations of discrimination; indeed, much of Dr. Nu's affidavit is spent recounting other professors' wholly conclusory beliefs that they had been discriminated against. But "[i]t is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citation omitted). Therefore, the conclusory attestations are insufficient to create an inference of discrimination.

There is, though, one marginally specific allegation of discriminatory conduct identified in Dr. Nu's affidavit—Dr. Nu's contention that "Dr. [Beta] sometimes accentuated perceived weaknesses of [foreign-born faculty of color whom] she did not prefer and accentuated the

perceived strengths of those she liked." This allegation is supported by Dr. Beta's evaluation of a Muslim, foreign-born faculty candidate, in which Dr. Beta noted that the candidate was difficult to hear and understand. But Dr. Beta apparently qualified that evaluation by stating that the faculty candidate could likely remedy any communication deficiency by speaking up in the classroom. At most, though, Dr. Beta's remark counts as an "ambiguous statement," but even then Abuelyaman still bears the burden of showing that such evidence "point[s] directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). It would take a Herculean leap in logic to construe Dr. Beta's benign remark about communication—immediately tempered by an acknowledgment that Dr. Beta's concerns might be easily assuaged once the candidate spoke up in the classroom—as containing some sort of racial animus. Absent any other specific allegations, which neither Dr. Nu nor Abuelyaman provide, this evidence cannot create a triable issue of fact on Abuelyaman's discrimination claim.

Next, Abuelyaman contends that Dr. Gamma's frustration with a Middle Eastern professor's (Dr. Delta) inability to attend meetings on Muslim days of worship is evidence of discriminatory animus. But in making this argument, Abuelyaman reads Dr. Gamma's statement out of context. What Dr. Gamma averred, in full, is that

> Dr. Delta was unavailable nearly every Friday and Monday, since he traveled to see his family in Kansas City, Missouri. In addition, I was directed that I could not organize meetings on Fridays in recognition of Dr.

> Delta's prayer day. Dr. Delta's consistent absences
> made scheduling meetings very difficult and often
> frustrating.

Taken as a whole there is nothing overtly discriminatory about this statement. Dr. Gamma's reflection on Dr. Delta's unavailability on Muslim prayer days is merely one part of an overarching concern about Dr. Delta's limited availability. This evidence thus does not create a genuine issue of material fact.

The last two pieces of evidence relate to Abuelyaman's annual evaluations: namely, the alleged discriminatory manner in which the IT School evaluated him, and the non-renewal of Abuelyaman's contract despite an improved performance evaluation. Neither piece of evidence, though, is sufficient to create a reasonable inference of discrimination. First, Abuelyaman's complaint about using student assessments in professors' evaluations does not show a discriminatory animus because every professor in the IT School was subjected to the same evaluation requirements, and at least one foreign-born faculty member of color performed well in the student assessment area.

Second, although Abuelyaman was fired despite his 2006 performance evaluation that marked a slight improvement over previous years, his previous five years of performance reviews were well below average. We have consistently held that an employee "'may create a triable issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies.'" *Burks*, 464 F.3d at 752 n.6 (quoting *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994)). Merely citing a marginal

improvement on a less-than-mediocre record is not enough to create a genuine issue of material fact—particularly when, as we noted above, professors with similarly poor records were also terminated. Thus, this evidence also does not create a genuine issue of material fact on Abuelyaman's discrimination claim. Because Abuelyaman is unable to produce any evidence that would create a triable issue of fact, the district court correctly granted summary judgment on his discrimination claim.

### B. Retaliation Claim

We now turn to Abuelyaman's retaliation claim. Abuelyaman also sought to prove retaliation under the direct method, again relying solely on circumstantial evidence. To establish retaliation under the direct method, Abuelyaman was required to show "(1) that [he] engaged in a statutorily protected activity, (2) that [he] suffered an adverse action taken by [his] employer, and (3) a causal connection between the two." *Jones*, 613 F.3d at 671 (7th Cir. 2010) (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008)). Here, the parties dispute only whether Abuelyaman engaged in protected activity and whether he has established a sufficient causal nexus between that activity and the adverse employment action he suffered; the parties agree that the adverse employment requirement was satisfied by the non-renewal of Abuelyaman's contract.

As we noted earlier, Abuelyaman advanced three arguments in support of his retaliation claim: specifically, that Illinois State did not reappoint him because: (1) he had

complained that using student evaluations to assess professors was unfair to foreign-born faculty members; (2) he had complained to Dr. Bowman that Dr. Zeta was the victim of discrimination; and (3) he had participated in Dr. Delta's complaint investigation. On appeal, Abuelyaman challenges the district court's rulings on (2) and (3) only. We address each argument below.

### 1. Dr. Zeta Complaint

On appeal, Abuelyaman contends that Illinois State retaliated against him because of his participation in the Diversity Office's investigation of Dr. Zeta's discrimination complaint. The district court granted Illinois State summary judgment on this theory of retaliation because Abuelyaman did not present it earlier in the case. Indeed, up to the point of summary judgment Abuelyaman's sole argument regarding Dr. Zeta's termination was that Abuelyaman had complained to Dr. Bowman that Dr. Zeta was the victim of discrimination. Abuelyaman argues that before summary judgment he did advance the argument that Illinois State retaliated against him because he participated in the Diversity Office's investigation of Dr. Zeta's discrimination complaint. Therefore, he argues, the district court should have considered this theory at summary judgment. Contrary to Abuelyaman's position, though, the record is entirely devoid of any mention of this argument before the summary judgment stage of the proceedings. It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion. *Andree v. Ashland*

*Cnty.*, 818 F.2d 1306, 1314 n.11 (7th Cir. 1987). Therefore, the district court did not err in refusing to consider Abuelyaman's argument at summary judgment, and in granting Illinois State summary judgment on that theory of retaliation.

Moreover, even if Abuelyaman had properly presented this argument, summary judgment would nonetheless still be appropriate because Abuelyaman never alleged specific facts that would have allowed for a reasonable inference that Status Committee members knew of his participation in Dr. Zeta's complaint investigation at the time they voted not to reappoint Abuelyaman. *See Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000) ("The critical issue . . . is whether the person who made the decision to terminate his employment was aware of the discrimination allegations at the time, because absent such knowledge [the plaintiff] lacks a causal link between the termination and the complaint of discrimination" (citing *Dey*, 28 F.3d at 1458)). In other words, Abuelyaman failed to put forth sufficient evidence to allow for a reasonable inference that his participation in the investigation of Dr. Zeta's complaint caused his non-reappointment. Therefore, even had this argument been properly before the district court, Abuelyaman could not avoid summary judgment.

## 2. Dr. Delta Complaint

Abuelyaman next challenges the district court's decision to grant judgment as a matter of law on his argument that he was retaliated against because he participated in Dr. Delta's complaint investigation. That complaint, filed in

Fall 2005, cited undue influence by Dr. Dennis in a Search Committee's efforts to locate a new professor for the IT School. The parties' chief dispute is whether Abuelyaman's participation in Dr. Delta's complaint investigation constituted a statutorily protected activity. Noticeably absent from Dr. Delta's complaint is any reference to discrimination on the part of Dr. Dennis. This is a serious deficiency; to be classified as a statutorily protected activity the complaint needs "to at least say something to indicate [discrimination] is at issue." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000). But there is nothing at all in Dr. Delta's complaint to indicate that a charge of illegal discrimination was being leveled against Dr. Dennis.

In an attempt to remedy this shortcoming, Abuelyaman contends that the reason Dr. Delta filed the complaint was because after the Search Committee had decided to recommend a Middle Eastern applicant, Dr. Dennis pushed a Caucasian candidate to the front of the list. Further, Abuelyaman claims that a jury could reasonably infer that a complaint filed with an office for "Diversity and Affirmative Action" discussed impermissible discrimination. But that is not what the law says. We must look to all of the circumstances surrounding the complaint and ask whether Abuelyaman has produced " 'evidence from which it could be *reasonably* inferred that [Illinois State] *more likely than not* knew [he] was concerned about [illegal] discrimination.' " *Id.* at 1008 (quoting *Senner v. Northcentral Technical Coll.*, 113 F.3d 750, 758 (7th Cir. 1997)). Abuelyaman may not "simply speculate[] as to what [his] supervisors knew"; rather, he must set forth tangible evidence that indicates Illinois State knew he was participating in a

complaint that concerned illegal discrimination. *Id.* at 1008 n.9.

In this case the evidence only reflects Dr. Dennis's undue influence exercised over the Search Committee—it does not allege any illegal discriminatory conduct. Indeed, Abuelyaman himself testified at trial that he did not recall mentioning race or nationality to the Diversity Office. Dr. Delta likewise testified that he complained only about Dr. Dennis's excessive interference with the Search Committee, that voting procedures were not followed, and that the candidate who was selected was not qualified. Moreover, the Diversity Office settled on a course of action that indicates its investigation did not focus on any discriminatory conduct: it elected to merely control the Search Committee's voting procedure. There is no indication that any action was taken to address a concern of illegal discrimination within the Search Committee itself. Without more, Abuelyaman's argument that he engaged in a statutorily protected activity by participating in Dr. Delta's complaint investigation necessarily fails. Accordingly, the district court did not err in granting judgment as a matter of law on this argument.[6]

---

[6] Abuelyaman also argues that it was only minutes after he informed Dr. Dennis of his participation in the Diversity Office's investigation that Dr. Dennis notified him that he would not be reappointed. He argues that a jury, therefore, could reasonably infer that Abuelyaman's non-renewal was based on his participation in a protected activity. *See Dey*, 28 F.3d at 1458 (citations omitted) ("Generally, a plaintiff may establish . . . a [causal] link

(continued...)

## IV. Conclusion

Abuelyaman did not present sufficient direct or circum-stantial evidence of discriminatory animus, and therefore the district court properly granted Illinois State summary judgment on Abuelyaman's discrimination claim. Abuelyaman's retaliation claim also fails because he did not present in a timely manner the theory that he was retaliated against because he participated in Dr. Zeta's complaint investigation, and because his other retaliation theory is premised on a complaint that does not constitute a statutorily protected activity. Accordingly, the district court properly granted Illinois State summary judgment on the former retaliation theory, and judgment as a matter of law at trial on the latter retaliation theory. For these reasons, we AFFIRM.

---

[6] (...continued)

through evidence that the discharge took place on the heels of protected activity.") Yet Abuelyaman's suspicious-timing argument is only availing if he engaged in a statutorily pro-tected activity—he did not, and therefore we need not address that argument further.

---